TIG INSURANCE COMPANY,
Plaintiff,

v.

SMART SCHOOL, Curtis Gordon, and J. J., a minor by her parent, Defendants.

No. 04–22178–CIV.

United States District Court, S.D. Florida.

Oct. 6, 2005.

Joshua D. Lerner, Michael Roland Holt, Rumberger Kirk & Caldwell, Miami, George J. Manos, Vincent P. Tomkiewicz, Bollinger Ruberry & Garvey, Chicago, IL, for TIG Insurance Company, Plaintiff.

Darlene M. Lidondici, Jeremy Michael Zubkoff, Fertig & Gramling, Fort Lauderdale, Curtis Gordon, Pro Se, c/o Florida Department of Corrections, Mark Hicks, Ellen Novoseletsky, Hicks Anderson & Kneale, Miami, Jorge Emilio Silva, Silva & Silva, Coral Gables, Jean Anne Kneale, Hicks & Kneale, Hollywood, for Smart School, Curtis Gordon, J.J., a minor by her parent, Defendants.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

UNGARO–BENAGES, District Judge.

THIS CAUSE is before the Court upon the following motions:

(1) Defendant Smart School's Motion for Summary Judgment, filed April 4, 2005 ("Smart School's Motion") [DE 43];

(2) Plaintiff TIG Insurance Co's. ("TIG") Motion for Summary Judgment ("TIG's Motion"), filed April 4, 2005 [DE 45]; and

(3) Defendant P.J.'s Cross Motion for Summary Judgment, filed May 12, 2005 ("P.J.'s Cross Motion") [1] [DE 91].

THE COURT has considered the motions, the pertinent portions of the record, and is otherwise fully advised in the premises. The matter is ripe for disposition.

The instant case arises initially from a disagreement regarding the interpretation of certain terms contained in identical comprehensive general liability policies that TIG issued to Smart School for the periods of August 6, 2001 to August 6, 2002 and August 6, 2002 to August 6, 2003. TIG, a Californian insurance company, seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* that its coverage with respect to sexual abuses perpetrated by Curtis Gordon, a Smart School teacher, is limited to the $1 million per occurrence limit specified in the first policy, despite

---

1. TIG moved to strike P.J.'s Cross–Motion arguing that it was filed well after the expiration of the deadline set by the Court's Scheduling Order issued November 10, 2004. *See* TIG's Motion to Strike. [DE 100] P.J. responded that TIG had not complied with discovery deadlines. The undersigned finds that P.J.'s Cross–Motion was untimely but the Court will consider it because it is "the course of action most consistent with the interest of judicial economy." *Matia v. Carpet Transport, Inc.,* 888 F.2d 118, 119 (11th Cir.1989). Accordingly, TIG's Motion to Dismiss P.J.'s Cross–Motion is denied.

the fact that Gordon molested two children separately on multiple occasions and the abuse of one of the children extended into the second policy period. TIG contends that the definition of "sexual abuse occurrence" contained in the policies collapses all of Gordon's acts of sexual abuse or molestation into a single incident during the initial policy period for the purpose of ascertaining the coverage limit. Smart School and P.J., the parent of one of the two children molested by Gordon, have asserted affirmative defenses and Smart School has asserted a counterclaim for declaratory relief in which they contend, *inter alia*, that the definition of "sexual abuse occurrence" is ambiguous and the policies should be construed to afford coverage of at least $1 million for Gordon's victimization of each child.

The dispute is before the Court because TIG has already settled with D.N., the parent of the other minor, for a sum which has largely depleted the $1 million per occurrence limit, and little coverage remains to compensate J.J. if TIG's interpretation is correct. As explained above, Smart School and P.J.'s disagree with TIG's interpretation. The Smart School alternatively contends in Count II of its Counterclaim that, if TIG's construction is correct, TIG violated its duty of good faith when it settled with the A.N. lawsuit without taking into consideration the impact on J.J.'s claim.

TIG, Smart School and P.J. have cross motioned for summary judgment respecting the proper interpretation of the TIG policies. Additionally, TIG has moved for summary judgment on Smart School's bad faith claim.

### I. Legal Standard

Summary judgment is appropriate "in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." *Northland Cas. Co. v. HBE Corp.,* 160 F.Supp.2d 1348, 1358 (M.D.Fla.2001). In a declaratory judgment action, "if the allegations in the complaint alleging a claim against the insured either are acts not covered by the policy or are excluded from the policy's coverage, the insurer is not obligated to defend or indemnify." *Id.* at 1357–58.

As to the Smart School's bad faith claim, a party is entitled to judgment as a matter of law when the party can show that there is no genuine issue of material fact. Fed. R.Civ.P. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Id.* at 323, 106 S.Ct. 2548. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the record presents factual issues, the court must not decide them, but rather, must deny the motion and proceed to trial. *Environmental Def. Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981).[2]

---

**2.** All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

## II. FACTS

### A. The Lawsuits and Settlement

Gordon sexually abused two Smart School students.[3] As a consequence, two lawsuits were filed in the Southern District of Florida.

First, on August 18, 2003, a lawsuit was filed styled *D.N., individually and as parent of A.N. v. Curtis Ramley Gordon, Jr. et al.,* Case No. 03–61249–CIV (S.D.Fla. 2003) (hereinafter the "A.N. lawsuit"). In the amended complaint in that action, D.N. alleged that the Smart School and certain of its administrators failed to respond properly to complaints that Gordon was inappropriately touching A.N., a twelve-year old female student in the Smart School's summer program. (A.N.lawsuit, Compl. ¶¶ 8–12.) The complaint alleged that beginning in July 2002 Gordon engaged in escalating acts of sexual misconduct with A.N. culminating in her rape on August 30, 2002. TIG defended Smart School and its employees against the allegations in the A.N. lawsuit pursuant to its 2001–2002 policy. On June 4, 2004, the Hon. Adalberto Jordan entered an order approving a confidential settlement of the A.N. lawsuit.

Second, on September 20, 2004, a lawsuit was filed styled *P.J., on behalf of J.J., et al. v. Curtis Gordon et al.,* Case No. 04–61230–CIV (S.D.Fla.2004) (hereinafter the "J.J. lawsuit"). In the J.J. lawsuit, P.J. alleged that the Smart School and certain of its administrators failed to respond properly to P.J.'s complaints that Gordon was having sexual intercourse with J.J., her thirteen year old daughter and an eighth grader at the Smart School. The first alleged incident of sexual abuse occurred in November 2001 and the last in May 2002. The J.J. lawsuit is still pending. *See* J.J. lawsuit.

Jorge Silva, Esq. represented the plaintiffs with respect to both claims. On April 2, 2004, when only the A.N. lawsuit was pending, he sent a demand letter to defense counsel, Pete L. DeMahy, Esq. of DeMahy, Labrador & Drake and Barry A. Postman, Esq. of Cole Scott & Kissane, in which he discussed the merits of both claims and requested to know "what the insurer's position is regarding the available limits of insurance for both the A.N. and the J.J. claim, who is also our client." (Smart School's Resp. Ex. 3 [DE 66].) At that time, Cole Scott and Kissane had been retained by TIG to defend the Smart School's interests with respect to A.N.'s claim. Also, no later than May 19, 2004, TIG retained Cole Scott & Kissane to represent Smart School with respect to J.J.'s claim.

According to Rebekah Ratliff, a TIG claims specialist, TIG first received notice of a claim against the Smart School on behalf of J.J. some time in May 2004 and TIG also reached an agreement with Silva for the settlement of A.N.'s lawsuit some time in May 2004. TIG never advised the Smart School prior to settling with D.N. that its position was that the per occurrence limit of $1 million contained in the first policy would apply to both claims.

### B. The TIG Insurance Policies

TIG issued two identical commercial liability policies to Smart School. The first policy covered the period from August 6, 2001 to August 6, 2002, and the second covered from August 6, 2002, to August 6, 2003.[4] The policies excluded coverage for

---

**3.** Gordon has been convicted of and sentenced for sexual battery and is now incarcerated in a Florida state prison. *See* http://www.dc.state .fl.us/ActiveInmates

**4.** P.J.'s Cross–Motion states that both policies covered the same time period, from August 6,

2001 to August 6, 2002. (P.J.'s Cross Motion ¶ 7.) The Court construes it to be a typographical error because the two policies attached to P.J.'s Cross–Motion covered two periods of time. The first policy, identified as "Policy Number: T7X–38840384–00" covered from

intentional acts.[5] However, TIG issued endorsement Form LB25787 to the insurance policies providing limited coverage for claims arising from sexual abuse as follows:

## SEXUAL ABUSE OR MOLESTATION
## LIABILITY COVERAGE FORM DECLARATIONS

ITEM 3.                          LIMITS OF INSURANCE:

| | |
|---|---|
| Each Sexual Abuse Occurrence Limit: | $1,000,000. |
| Aggregate Limit: | $3,000,000. |
| Defense Expense–Each Sexual Abuse Occurrence Limit | $1,000,000. |
| Defense Expense–Aggregate Limit: | $3,000,000. |

. . . .

## SECTION I—COVERAGE

## SEXUAL ABUSE OR MOLESTATION LIABILITY

A. Insuring Agreement
   1. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" caused by a "sexual abuse occurrence". We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "sexual abuse occurrence" and settle any claim or "suit" that may result.
   But:
   a. The amount we will pay for damages is limited as described in **SECTION III—LIMITS OF INSURANCE;**
   b. The amount we will pay as "defense expenses" is limited as described in **SECTION III—LIMITS OF INSURANCE;** and
   c. Our right and duty to defend end upon the earlier of the following:
      (1) When we have used up the Limit of Insurance in the payment of judgment or settlement; or
      (2) When we have used up the Defense Expense Limit in payment of "defense expenses".
   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS.**
   2. This Insurance applies to a "sexual abuse occurrence" only if it
      a. Takes place in "the coverage territory"; and

August 6, 2001 to August 6, 2002. The second policy, identified as Policy Number: "T6–38866267–01" covered from August 6, 2002 to August 6, 2003. (P.J.'s Cross Motion Exs. C, D.) Otherwise, the parties do not dispute that there were two policies: one covering the period from August 2001 to August 2002,and another covering the period from August 2002 to August 2003.

5. In pertinent part, TIG's insurance policy provides:

This insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of:

1. The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or
2. The negligent:
   a. Employment;
   b. Investigation;
   c. Supervision;
   d. Reporting to the proper authorities, or failure to so report; or
   e. Retention;
   of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph 1. above.
(Compl. Ex. C.)

b. During the policy period. If the "sexual abuse occurrence" consists of a series of related acts of sexual abuse or molestation, the "sexual abuse occurrence" shall be deemed to have taken place on the date of the first of such series of acts. No coverage is afforded under this policy if the first act of "sexual abuse occurrence" took place outside the policy period.

. . . .

### SECTION III—LIMITS OF INSURANCE

A. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
1. Insureds;
2. Claims made or "suits" brought; or
3. Persons or organizations making claims or bringing "suits".
B. The Aggregate Limit Shown in the Declarations is the most we will pay for all damages under this Coverage Form.
C. Subject to paragraph B. of this section, the Each Sexual Abuse Occurrence Limit shown in the Declarations is the most we will pay under this Coverage Form for all damages arising out of any one "sexual abuse occurrence".

. . . .

### SECTION V—DEFINITIONS

. . . .

G. "Sexual abuse occurrence" means:
1. A single act, or multiple, continuous, sporadic, or related acts of sexual abuse or molestation caused by one perpetrator, or by two or more perpetrators acting together. "Sexual abuse occurrence" includes "negligent employment" of any person accused of or involved in such sexual abuse or molestation. A "sexual abuse occurrence" must occur while the claimant is in the care, custody or control of an insured, or a person or entity indemnified under an insured contract pursuant to which the Named Insured has legal responsibility for the person or entity.
2. All acts of "sexual abuse occurrence" by an actual or alleged perpetrator or perpetrators, including "negligent employment" of such perpetrator or perpetrators, shall be deemed and construed as one occurrence which takes place when the first act of sexual abuse or molestation occurs, regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual abuse or molestation took place.

(P.J.'s Cross Motion for Summary Judgment Ex. C. at 1–7.)

### III. Arguments Regarding The Interpretation Of The Policy

#### A. TIG's Interpretation

TIG seeks a declaration that Gordon's sexual abuse of A.N. and J.J. is a single occurrence pursuant to the terms of the 2001–2002 policy and that therefore, TIG's financial responsibility for both claims is limited to $1 million. TIG reasons that the claims arise under the 2001–2002 policy because both A.N. and J.J. were first molested by Gordon while attending the Smart School during the 2001–2002 policy year and, the policy provides: " 'All acts of sexual abuse occurrence' shall be deemed

and construed as one occurrence which takes place when the first act of sexual abuse or molestation occurs, regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual abuse or molestation took place." *Id.* at 7. Both claims, TIG continues, are identical for coverage purposes because D.N. and P.J. alleged that the Smart School's administrators negligently failed to respond to their complaints that their children were being molested and, in the language of the policy, the abuse consisted of "multiple ... acts of sexual abuse ... caused by one perpetrator ..." According to TIG, these policy provisions are clear and unambiguous in providing that Gordon's multiple acts of sexual abuse involving A.N. and J.J. constitute a single occurrence under the first policy and the Court should apply them as written.

### B. Smart School's Interpretation

Smart School contends that the interplay between the policy definition of "Sexual Abuse Occurrence" and the Aggregate Limit provisions are irreconcilable unless the TIG policy is interpreted in a manner which would provide coverage up to the $3 million aggregate limit for multiple occurrences of sexual abuse by one perpetrator (or two or more perpetrators acting together) when there is more than one victim. In making this argument, Smart School does not argue that the definition of "sexual abuse occurrence" in the policy is internally ambiguous. Rather, Smart School argues that if all acts of sexual abuse by a single perpetrator are collapsed into a single occurrence, the aggregate limits provisions could never be triggered and are therefore illusory. Smart School argues that in order to avoid this result,

the Court should construe the relevant policy provisions against TIG and find that J.J.'s and A.N.'s victimization constitute multiple occurrences of sexual abuse for which there is coverage up to the $3 million aggregate limit.

### C. P.J.'s Interpretation

P.J. argues that the policy definition of "sexual abuse occurrence" is ambiguous in several respects and therefore should be construed to afford $1 million per occurrence coverage for each victim. Second, like Smart School, P.J. argues that TIG's interpretation of the aggregate limit provision renders the endorsement illusory. Third, P.J. argues that pursuant to the language TIG employed in the separate deemer clauses that appears in paragraph A(2)(b) of the endorsements, Gordon's rape of A.N. in the second coverage year is "unrelated" to his lewd touching of her in the first policy year and therefore, the $1 million per occurrence limit provided by each policy should be available for each type of injury that A.N. suffered or that the coverage for A.N.'s injuries should be allocated between the two TIG policies.[6] Alternatively, P.J. argues that the deemer clauses, which establish a "first encounter rule" for the purpose of determining under which policy a claim is covered, impose an arbitrary trigger of coverage and are therefore invalid.

### IV. Legal Analysis

In this diversity action the Court must apply the substantive law of the forum state, Florida. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *LaFarge Corp. v. Travelers Indem. Co.,* 118 F.3d 1511, 1515 (11th Cir.

---

6. The deemer clause in each policy states: "If the 'sexual abuse occurrence' consists of a **series of related acts** of sexual abuse or molestation, the 'sexual abuse occurrence' shall be deemed to have taken place on the date of the first such series of acts." (emphasis added)

1997). In Florida, courts interpret insurance policies with a view of giving the contract full effect. *Hoffman v. Robinson,* 213 So.2d 267, 268 (Fla. 3d DCA 1968) (holding that the legal effect of a contract must be determined from words of entire contract and court may not violate the clear meaning to create ambiguity). Therefore, all of the provisions, words and parts must be construed together as one entire contract. *Sugar Cane Growers Coop. of Fla., Inc. v. Pinnock,* 735 So.2d 530, 535 (Fla. 4th DCA 1999) ("[i]n construing a contract, the legal effect of its provisions should be determined from the words of the entire contract").

Florida courts enforce insurance contracts in accordance with their plain language. *See Rose v. M/ v. "Gulf Stream Falcon,"* 186 F.3d 1345, 1350 (11th Cir. 1999); *see also Am. Med. Int'l, Inc. v. Scheller,* 462 So.2d 1, 7 (Fla. 4th DCA 1984) (stating that where a contract is clear and unambiguous, its meaning and legal effect are questions of law for determination by the court alone). However, if the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the policy is ambiguous. Ambiguous policy provisions are to be construed in favor of coverage and against the insurer. *Continental Cas. Co. v. Wendt,* 205 F.3d 1258, 1261 (11th Cir.2000).

Whether a policy provision is ambiguous is a question of law. *State Farm Fire & Cas. Co. v. Metro. Dade County,* 639 So.2d 63, 65 (Fla. 3rd DCA 1994). However, "an ambiguity is not invariably present when a contract requires interpretation, and the mere failure to define a term involving coverage does not necessarily mean a term is ambiguous." *Continental Cas. Co.,* 205 F.3d at 1262. Also, merely because a contract possibly can be interpreted in more than one manner or requires analysis to comprehend its

scope does not mean an ambiguity exists. *Shipner v. Eastern Air Lines, Inc.,* 868 F.2d 401, 409 (11th Cir.1989) (Clark, J., dissenting) (including a discussion of Florida law); *Am. Motorist's Ins. Co. v. Farrey's Wholesale Hardware,* 507 So.2d 642 (Fla. 3d DCA 1987).

*A. The Definition of "Sexual Abuse Occurrence" is Unambiguous*

In order to resolve the parties' cross motions for summary judgment, the Court must decide, among other issues, whether Gordon's sexual abuse of A.N and J.J. is a single occurrence or two separate occurrences according to the definition of "sexual abuse occurrence" in the endorsement. Beginning as the Court must with the language TIG employed, the Court notes that the definition of "a sexual abuse occurrence" in the first paragraph plainly encompasses multiple acts of sexual abuse caused by "one perpetrator." Additionally, those acts need not be related as reflected by TIG's use of the terms "multiple" and "sporadic" and then following them with the phrase "or related." It seems clear from the use of the disjunctive "or" after the terms "multiple" and "sporadic" and preceding the term "related" in the first sentence of the first paragraph ("a single act, or multiple, continuous, sporadic, or related acts of sexual abuse ..."), that the definition contemplates that either related or unrelated incidents of sexual abuse by one perpetrator are to be treated as a single occurrence. Further, while it is true that the definition does not state explicitly whether the abuse of multiple victims by a single perpetrator is a single occurrence, it does provide in the second paragraph of the definition that "*[a]ll acts* of 'sexual abuse occurrence'" are to be deemed as a single occurrence that takes place when the first act of sexual abuse occurs. (emphasis added). And, presumably to reinforce the notion that the defini-

tion is intended to encompass all acts of sexual abuse by a single perpetrator, the second paragraph further provides that "*all* acts of sexual abuse occurrence" by a single perpetrator or perpetrators are to be deemed a single occurrence "*regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual abuse or molestation took place.*" (emphasis added). This language is straightforward, comprehensive, and susceptible of only one reasonable interpretation: that the definition of "sexual abuse occurrence" encompasses all of Gordon's acts of sexual misconduct while a Smart School employee regardless of the individual circumstances pertaining to each act comprising a "sexual abuse occurrence."

In reaching this conclusion, the undersigned is mindful that Florida has adopted the "cause" theory to assess whether one or more "occurrences" have taken place as the term "occurrence" might appear or be defined in many comprehensive general liability policies. The theory has been utilized by the courts where, unlike in this case, the "occurrence" policy either failed to define "occurrence" or defined "occurrence" as being in the nature of an accident "including continuous or repeated exposure to substantially the same harmful conditions." *See New Hampshire Ins. Co. v. RLI Ins. Co.*, 807 So.2d 171, 172 (Fla. 3d DCA 2002) (reasoning that "[t]he act which causes the damage constitutes the occurrence"); *See also Koikos v. Travelers Ins. Co.*, 849 So.2d 263 (Fla.2003) (holding that each separate pull of a trigger during the same shooting spree is an event sufficiently in time and space to constitute an independent occurrence).

In such cases, courts inquire whether "there was but one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damages." *Am. Indem. Co. v. McQuaig*, 435 So.2d 414, 415

(Fla. 5th DCA 1983) (quoting *Bartholomew v. Ins. Co. of N. Am.*, 502 F.Supp. 246, 252 (D.R.I.1980)), *aff'd*, 655 F.2d 27 (1st Cir. 1981). That inquiry, if relevant in this case, could lead to the conclusion that Gordon's sexual misconduct as to each child was the proximate cause of each of their injuries and therefore comprised two occurrences. *Cf. Koikos*, 849 So.2d at 272 (concluding that "using the number of shots fired as the basis for the number of occurrences is appropriate because each individual shooting is distinguishable in time and space"). Or even to the conclusion that each act of abuse or molestation was a separate occurrence. *See Society of Roman Catholic Church v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1364 (5th Cir. 1994) (applying Louisiana law, the court found that when thirty-one children were molested by two priests, the cumulative injury to each child constituted a separate occurrence with respect to claims against the church); *See also Worcester Ins. v. Fells Acres Day Sch., Inc.*, 408 Mass. 393, 558 N.E.2d 958, 973–74 (1990) (holding that numerous discrete acts of abuse by several different defendants at different locations comprised more than one occurrence). However, the inquiry is irrelevant in this case because, as explained above, TIG provided a distinct definition employing unambiguous language that serves to collapse all sexual misconduct by a single perpetrator into a single occurrence.

■ The Court has also carefully considered P.J.'s contentions that TIG's failure to employ the phrase "all sexual abuse" in the definition and its use of the phrase "regardless of the number of persons involved" instead of "regardless of the number of victims [or claimants] involved" renders the definition of "sexual abuse occurrence" ambiguous. However, there is no legal requirement that TIG employ any particular language in order to describe the occurrence for which it agreed to in-

demnify the Smart School. *Luther v. Fidelity & Deposit Co.*, 679 F.Supp. 1092, 1093 (S.D.Fla.1986) ("[t]he law is well established that where the language in a clause of an insurance contract is plain and unambiguous, no special construction or interpretation is required and the language will be given that meaning which it clearly expresses"). Likewise, the court is unable to attribute any significance to the fact that TIG utilized the singular "claimant" in the definition as the singular generally includes the plural in the interpretation of contracts unless, as is not the case in the instant matter, it is clear that the parties intended otherwise. *Watts v. Organogenesis Inc.*, 30 F. Supp 2d 101, 110 (D.Mass.1998); *See also Crouch on Insurance*, § 22:5 at 21–25 (3d. ed.1997).

Finally, the Court has considered the two cases upon which P.J. relies to argue that the definition of "sexual abuse occurrence" in the TIG policy is ambiguous: *Ran–Nan, Inc. v. General Accident Insurance Company of America*, 252 F.3d 738 (5th Cir.2001) and *Goose Creek Consolidated I.S.D. v. Continental Cas. Co.*, 658 S.W.2d 338 (Tex.App.—Hous. (1 Dist.) 1983). These cases are inapposite. In *Goose Creek*, the insurance policy defined "loss occurrence" as a "single event." Understandably, the Texas court found that two arson fires set at separate times at separate locations were discrete events and therefore separate occurrences. In *Ran–Nan*, two employees caused losses through entirely independent thefts. The court concluded that one loss with two unrelated causes constituted two "occurrences." In the instant case, the causes are related at least to the extent that all of the instances of sexual abuse were perpetrated on Smart School students while Gordon was employed there as a teacher. Moreover, the *Ran–Nan* court relied on the "cause theory" to determine whether the thefts were one or two occurrences. As explained above, the cause theory is inapplicable in this case due to the policy language.

## B. The Sexual Abuse Endorsement is not Illusory

■ Both P.J. and the Smart School argue that the TIG policy is illusory because, under TIG's interpretation of the endorsement, multiple acts of sexual abuse by multiple perpetrators acting together or independently comprise one occurrence and that then there is no set of facts which would trigger the Aggregate Limits clause providing coverage of up to $3 million for multiple "sexual abuse occurrences." Their argument fails because TIG's interpretation actually is that acts of sexual abuse by two or more perpetrators acting independently beginning in a single policy period would constitute more than one occurrence and, therefore, could trigger the aggregate limits provisions depending on the extent of injuries or damage. (TIG's Reply at 11–12 [DE 92].)

■ When policy provisions, limitations, or exclusions completely contradict the insuring provisions, insurance coverage becomes illusory. *Lineberry v. State Farm Fire & Cas. Co.*, 885 F.Supp. 1095, 1099 (M.D.Tenn.1995). That was the situation in each of the two cases cited by the Smart School: *Purrelli v. State Farm Fire and Cas. Co.*, 698 So.2d 618 (Fla. 2d DCA 1997)[7] and *Mo. Intergovernmental Risk*

---

7. In *Purrelli*, a chiropractor was sued for invasion of privacy for allegedly taking inappropriate videos of a female employee, who was also a patient, during treatment sessions. 698 So.2d at 618. State Farm, the insurer, sought a declaratory judgment that it was not required to provide coverage. The policy explicitly defined personal injury to include "invasion of privacy and eleven other intentional torts although it also contained a provision excluding personal injuries that were 'expected or intended by the insured.'" *Id.* It was, as the court noted, a policy that "purports to

*Mgnt. Ass'n v. Gallagher Bassett Services Inc.*, 854 S.W.2d 565 (Mo.App.1993).[8] However, in this case even TIG agrees that the aggregate limits clause could be triggered if two or more perpetrators, acting independently, committed "sexual abuse occurrences" beginning in a single policy year. Therefore, the Court cannot agree that the aggregate limits coverage is illusory.

### C. Gordon's Abuse of A.N. is a "Series of Related Acts" Pursuant to the Deemer Clause

██ P.J. further argues that the Court should find that Gordon's molestation of A.N. during the initial policy period was "unrelated" to Gordon's rape of A.N. during the second policy period in order to avoid the application of the deemer clauses contained in Paragraph (A)(2)(b) of the endorsements. In making this argument, P.J. points to the fact that in the deemer clauses a "sexual abuse occurrence" is deemed to have occurred when the first of a "series of related acts" of sexual abuse or molestation occurred without supplying a definition for the phrase "series of related acts." Therefore, P.J. argues, a reasonable interpretation of the deemer clauses is that Gordon's lewd touching of A.N. during the first policy period is a singular and separate occurrence from Gordon's rape of A.N. during the second policy year, for which the $1 million per occurrence limits under each policy are applicable.

Florida cases are clear that "the lack of a definition of an operative term in a policy does not necessarily render the term ambiguous and in need of interpretation by the courts." *Swire Pac. Holdings,* 845 So.2d at 166 (quoting *State Farm Fire & Cas. Co. v. CTC Dev. Corp.,* 720 So.2d 1072, 1076 (Fla.1998)); *See also Deni Associates,* 711 So.2d at 1139 (stating "[w]e also reject the argument that because the words 'irritant' and 'contaminant' are not defined, the policy exclusion is ambiguous"). Further, although the undersigned has been unable to locate a Florida case interpreting the phrase "series of related acts" in a comprehensive general liability policy, at least two courts applying Florida law have concluded that similar phrases in professional liability policies are unambiguous despite the lack of a definition of the term "related," and that in such instances the term "related" should be attributed its ordinary meaning. In *Continental Cas. Co. v. Wendt,* 205 F.3d 1258 (11th Cir. 2000), the Eleventh Circuit affirmed the district court's conclusion that a policy provision that "[a]ny claim or claims arising out of the same or related wrongful acts, shall be considered first made during the policy term in which the earliest claim arising out of such wrongful acts was made" was unambiguous. *Id.* at 1264. The district court noted that Florida courts commonly adopt the plain meaning of words contained in legal and non-legal dictionaries, and that the plain meaning of

---

insure invasion of privacy, an intentional tort, but excludes acts 'intended' by the insured and limits coverage to 'accidents.' " *Id.* In concluding that the policy was illusory and the insurer was liable, the court noted that "the limitation and exclusion completely swallowed up the insuring provision creating the 'grossest form of ambiguity.' " *Id.* at 619. (citations omitted).

**8.** In *Mo. Intergovernmental Risk Mgnt. Ass'n.* ("MIRMA"), MIRMA, a risk management cor-

poration, had contracted to provide liability coverage to a municipal entity that was sued under the Federal Civil Rights statutes. 854 S.W.2d at 565. The policy's definition of "personal injury" included intentional torts while the definition of "occurrence" limited coverage to the consequences of unintentional acts only. *Id.* In a footnote, Judge Smith stated that allowing an insurer to take away with one hand what it had given with the other would create illusory coverage. *Id.* at 570 n. 2.

the word "relate" is to show or establish a logical or causal connection between. *Id.* at 1262. Therefore, an attorney's written and oral misrepresentations to over forty investors in connection with the sale of promissory notes comprised "related wrongful acts," notwithstanding that they resulted in a number of different harms to different persons with potentially different causes of action. *Id.* at 1264. Similarly, in *Pacific Employers Ins. v. Ott,* 545 So.2d 462 (Fla. 3d DCA 1989), the court held that an insurance policy which provided that multiple claims or suits arising out of a single act of omission or related series of acts or omissions are to be treated as one claim was unambiguous. *Id.* at 463–64.

Consistent with the foregoing authorities, the undersigned finds that the phrase "series of related acts" in the TIG policy is unambiguous and that the ordinary meaning of the term "related" compels the conclusion that all of Gordon's abusive conduct toward A.N. was logically and causally related in at least the following respects: the identity of the perpetrator, the identity of the victim, and the relationship of teacher and student. As a consequence, all of his wrongful conduct with respect to A.N. is "deemed to have taken place on the date of the first of such series of acts," i.e., in July 2002, within the first policy period.

In reaching this conclusion, the Court notes that *Am. Commerce Ins. Brokers v. Minnesota Mut. Fire and Cas. Co.,* 551 N.W.2d 224 (Minn.1996), on which P.J. relies, is not to the contrary to the extent it addresses the meaning of the similar phrase "series of related acts." In that case, the policy stated that with respect to employee dishonesty: "All loss or damage: (1) Caused by one or more persons; or (2) Involving a single act or series of related acts; is considered one occurrence." *Id.* at 226. The Minnesota Supreme Court held that the phrase "series of related acts" was unambiguous and that acts are

"related" when they are logically and causally connected. *Id.* at 231. However, the Minnesota court then concluded that two distinct embezzlement schemes implemented by the same employee during the same time period were two separate "series of related acts" and therefore two occurrences. *Id.* It held that with respect to dishonest acts a court may consider several factors in concluding whether they are a part of a "series of related acts," including whether the acts are connected by time, place, opportunity, pattern and, "most importantly, method or modus opperandi." *Id.* The undersigned declines to follow *American Commerce* to the extent it attempts to further define the term "related" by providing a non-exhaustive list of factors to be considered in assessing whether acts are sufficiently connected to be considered "related." No Florida case has adopted that approach and with respect to the policy in the instant case, such an analysis would potentially defeat the policy definition of occurrence which appears to collapse all acts of sexual misconduct by a single perpetrator into one "sexual abuse occurrence" regardless of timing, location, number of perpetrators or number of incidents. As for *St. Paul Fire and Marine Ins. Co. v. Chong,* 787 F.Supp. 183 (D.Kan. 1992), *aff'd,* 979 F.2d 858 (10th Cir.1992), the *Wendt* panel adopted the district court's rejection of its conclusion that the term "related" is ambiguous and, *Wendt* is binding on this court. *Continental Cas. Co.,* 205 F.3d at 1262.

### D. The Deemer Clauses do not Conflict with the "Sexual Abuse Occurrence" Definition

■ As explained above, the second paragraph of the definition of "sexual abuse occurrence" provides that "*[a]ll acts of 'sexual abuse occurrence' shall be deemed and construed as one occurrence which takes place when the first act of*

sexual abuse or molestation occurs ...." (emphasis added). On the other hand, the deemer clauses that appear in paragraph (A)(2)(b) of the endorsements provide that only when a "sexual abuse occurrence" consists of a "series of related acts" will it be deemed to have taken place on the date of the first such series of acts. Specifically, the deemer clauses state: "If the 'sexual abuse occurrence' consists of *a series of related acts* of sexual abuse or molestation, the 'sexual abuse occurrence' shall be deemed to have taken place upon the date of the first such series of acts." (emphasis added). Noting the apparent conflict between TIG's use of the phrase "all acts" in the definition and TIG's's use of the phrase "series of related acts" in the deemer clauses, both ostensibly for the same purpose of determining the coverage year, the Court requested supplemental briefing with respect to whether the provisions conflict and, if so, how they should be harmonized. The Court's ultimate concern was that the two provisions could be harmonized only by construing the definition of "sexual abuse occurrence" to require a "series of related acts;" in that case the relationship between Gordon's abuse of the two victims might be too tenuous to be deemed a single occurrence since the only common factor would be his identity as the perpetrator.

Having considered the parties' supplemental memoranda, the undersigned is satisfied that TIG is correct that the provisions do not conflict and that they should be enforced as written. As TIG points out, the deemer clauses address when a claim "occurred" for the purpose of determining whether it falls within any particular coverage period, whereas the definition of "sexual abuse occurrence" addresses whether separately covered claims will be treated as one or more occurrences for the purpose of determining the extent of TIG's exposure under the applicable policy. This construction is consistent with numerous cases involving occurrence policies that make a distinction between the issue of whether and under what policy particular claims are covered versus the issue of whether, if there is coverage, the claims amount to more than one occurrence. *See, e.g., Michigan Chemical Corp. v. Am. Home Assur. Co.,* 728 F.2d 374 (6th Cir. 1984); *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56 (3d Cir.1982); *Champion Int'l Corp. v. Continental Cas. Co.,* 400 F.Supp. 978 (S.D.N.Y.1975), *aff'd,* 546 F.2d 502 (2d Cir.1976); *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368 (E.D.N.Y.1988). Additionally, this construction avoids the necessity of disregarding the first paragraph of the definition that refers to "... multiple, ... sporadic or related acts of sexual abuse or molestation," which the Court has found plainly covers both related and unrelated acts. *See City of Homestead v. Johnson,* 760 So.2d 80, 83 (Fla.2000) (stating that pursuant to Florida contract law "any ambiguity in the terms should be resolved in favor up upholding the purpose of the agreement and giving effect to every term in the agreement"); *See also Sugar Cane Growers Coop. of Fla., Inc. v. Pinnock,* 735 So.2d 530, 535 (Fla. 4th DCA 1999) (holding that contracts should be interpreted to give effect to all provisions); *Paddock v. Bay Concrete Indus., Inc.,* 154 So.2d 313, 315 (Fla. 2d DCA 1963) (stating that "[a]ll the various provisions of a contract must be so construed, if it can reasonably be done, as to give effect to each"). Accordingly, the Court finds that the deemer clauses and the definition of "sexual abuse occurrence" address unrelated issues and therefore, all of Gordon's acts of sexual abuse or molestation of A.N. and J.J., related or not, comprise one "sexual abuse occurrence" within the meaning of the TIG policy.

*E. The Deemer Clauses Are Valid and Enforceable*

■ P.J.'s final argument is that the deemer clauses should not be enforced as written because they arbitrarily trigger coverage in accordance with the "first encounter rule" under which "a single occurrence begins at the time of the first libidinous encounter and is the cause of all subsequent injury." *See Roman Catholic Diocese of Joliet, Inc. v. Interstate Fire Ins. Co.*, 292 Ill.App.3d 447, 226 Ill.Dec. 477, 685 N.E.2d 932, 938 (1997). According to P.J., the clauses are "arbitrary" because they insulate TIG from any liability in the situation where a child is molested during the policy period if the first act of sex abuse occurred before the policy became effective, or they unreasonably limit TIG's liability to the per occurrence limit in one policy period even if the sexual abuse or molestation extends over several policy periods. (P.J.'s Cross Motion at 19–21.)

In support, P.J. relies upon two lines of cases, both of which are inapposite.[9] The first consists of *United Tech. Corp. v. Liberty Mut. Ins. Co.*, 1993 WL 818913 (Mass.Super 1993), *Liberty Mut. Ins. Co. v. Black & Decker Corp.*, 2004 WL 1941351 (D.Mass.2004) and *Endicott Johnson Corp. v. Liberty Mut. Ins. Co.*, 928 F.Supp. 176 (N.D.N.Y.1996). As to these cases, P.J. suggests misleadingly that the courts were called upon to construe deemer clauses similar to those in this case and concluded they were unenforceable as written. In fact, those courts were called upon to construe deemer clauses which, unlike the clauses in this case, provided more or less that claims on account of injuries to property caused by exposure to conditions over a period of time would be deemed to occur only on the last day of exposure. The courts held that the deemer clauses were illusory because, in the case of pollution damage, the last day of exposure might never be known and therefore coverage might never be "triggered."

The second line of cases consists of *Roman Catholic Diocese of Joliet, Inc. v. Interstate Fire Ins. Co.*, 292 Ill.App.3d 447, 226 Ill.Dec. 477, 685 N.E.2d 932 (1997) and *Society of the Roman Catholic Church of the Diocese of Lafayette v. Interstate Fire & Cas. Co.*, 26 F.3d 1359 (5th Cir.1994). In these cases, the insurance policies defined "occurrence" as "a continuous or repeated exposure to conditions which . . . result in personal injury . . . during the policy period . . . ," and further provided that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence." *Diocese of Joliet*, 226 Ill.Dec. 477, 685 N.E.2d at 934; *Diocese of Lafayette*, 26 F.3d at 1363–64. Construing this language, which does not appear in the TIG policies, the courts held that sexual abuse by a priest in multiple policy periods constitutes an occurrence in each policy period and each policy's coverage is triggered by the first instance of abuse occurring during its period of coverage.

---

9. P.J. also cites to *Am. Home Products Corp. v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y.1983) for the proposition that the parties to an occurrence-based policy providing coverage for "personal injury, sickness or death resulting therefrom . . . which occurs during the policy period" and excluding coverage for injuries caused by continuous or repeated exposure "any part of which occurs after the termination of the policy," intended and understood the basic policy coverage to apply to injuries shown in fact to have occurred during the policy period. (P.J.'s Cross-motion at 21.) This case is also inapposite because the policy under consideration therein, unlike TIG's policies, did not address acts of intentional misconduct nor language expressly addressing when such misconduct would be deemed to have occurred.

In this case, the policies expressly provide for application of the first encounter rule by stating in the deemer clause that "the 'sexual abuse occurrence' shall be deemed to have taken place on the first of such series of acts" and by stating in the definition that "all acts ·of 'sexual abuse occurrence' ... shall be deemed and construed as one occurrence which takes place when the first act of sexual abuse or molestation occurs ...." P.J. has not explained, and the court can perceive no basis for, the contention that these clauses are arbitrary. After all, TIG obviously made a deliberate decision to include this language in order to limit its liability in the event that the Smart School employed a pedophile who might reasonably be expected to take advantage of the school setting by engaging in multiple acts of sexual misconduct with more than one victim, and the Smart School obviously acquiesced in order to obtain at least some coverage for sexual misconduct by its employees. Moreover, unlike in the pollution exposure cases, the coverage "trigger" is ascertainable and therefore not illusory.

Notably, in *Diocese of Joliet*, the court acknowledged that "[t]he first encounter rule may apply where the parties agree that all damage occurred at the time of the first sexual encounter." In this case, the parties were free to define the scope of coverage for sexual misconduct by incorporating the first encounter rule among the insuring provisions and P.J. has supplied no legitimate reason why it should not be enforced as written. *See Green v. Life & Health of Am.*, 704 So.2d 1386, 1391 (Fla. 1998) (holding that "[a]ssuming compliance with a standard form and the absence of conflict with statute, the parties to a contract of insurance are free to incorporate such provisions and conditions as they desire"); *See also Quinerly v. Dundee Corp.*, 159 Fla. 219, 31 So.2d 533, 534 (1947) (reasoning that "[c]ourts are powerless to rewrite contracts or interfere with the freedom of contracts or substitute [their] judgment for that of parties to the contract in order to relieve one of the parties from apparent hardships of an improvident bargain"). Therefore, P.J.'s final argument fails as well.

### F. TIG is Entitled to Summary Judgment on the Smart School's Counterclaim

In Count II of its Counterclaim, Smart School alleges that TIG, as its insurer, owed Smart School a duty of good faith and that "TIG breached this duty by its adjustment and settlement of the [A.N. lawsuit] to the exclusion of the J.J. claim of which it was fully cognizant at the time of the settlement." (Counterclaim ¶ 22 [DE 12].) TIG answered by denying Smart School's Counterclaim and moving to abate it. (Motion to Abate Count II of Defendant's Counterclaim [DE 18].) The Court denied TIG's Motion. (Order Denying Motion to Abate [DE 33].)

TIG now moves for summary judgment on Smart School's bad faith claim. TIG contends that there is no genuine issue of material fact and that the Court should find, as a matter of law, that the Smart School cannot prove that TIG breached its duty of good faith when it settled the A.N. lawsuit. TIG claims that "Smart School would be entitled to a jury trial on the 'bad faith' issues only if it first established that the settlement of the A.N. lawsuit was *not* reasonable." (TIG's Response to Smart School's Motion for Summary Judgment at 14.)

### G. Insured's Duty of Good Faith

██ Under Florida law, when an insured has surrendered all control over the handling of a claim to the insurer, the insurer assumes "a duty to exercise such control and· make such decisions in good faith and with due regard for the interests

of the insured." *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So.2d 783, 785 (Fla. 1980). The insurer is required to investigate the facts and give fair consideration to the claims pending. *See id.* In other words, the "insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.*

In *Farinas v. Florida Farm Bureau Gen. Ins. Co.*, 850 So.2d 555 (Fla. 4th DCA 2003), the court applied *Boston Old Colony Ins. Co.* to a multiple claim scenario in which the insurer settled with some of the claimants to the exclusion of others. In that case, a driver, Nicholas Copertino, lost control of his car and crossed a median, hitting an oncoming vehicle. *Id.* at 557. The crash caused the deaths of five teenagers and severe injuries to another seven, including Copertino and a 14–year-old girl rendering her a quadriplegic. *Id.* Copertino's liability for those resulting injuries was not in question. *Id.* Copertino was covered by his father's insurance policy with liability limits of $100,000 per claim and $300,000 per accident. *Id.* The insurer settled for the policy limits with two of the claimants and filed a declaratory judgment action against the insured, Copertino, to determine whether it had any further duty to defend Copertino after having paid the policy limits. The remaining claimants filed third-party bad faith actions alleging that the insurer had entered into the settlements without due regard for the interests of the insured. The insurer moved for summary judgment against all claimants and the trial court granted it based on established Florida law allowing an insurer complete discretion in settling multiple claims. *Id.* at 557–58.

On appeal, the Fourth District reversed. According to the court, an insurer has three specific duties. First, the insurer is required to "fully investigate all the claims at hand to determine how to best limit the insured's liability." *Id.* at 560. The court noted, however, that an insurer has some "discretion in how it elects to settle claims, and may even choose to settle certain claims to the exclusion of others, provided this decision is reasonable and in keeping with its good faith duty." *Id.* at 561. Second, the insurer should seek "to settle as many claims as possible within the policy limits." *Id.* at 560. Third, the insurer has a "duty to avoid indiscriminately settling selected claims and leaving the insured at risk of excess judgments that could have been minimized by wiser settlement practice." *Id.* The *Farinas* court then found that jury questions remained as to whether the insurer's failure to pursue global and other settlement options with all the claimants was in the insured's best interests, whether the insurer's settlement with the three claimants was reasonable, and whether the insurer investigated the facts underlying all the claims. *Id.* at 561.

As summarized by the United States District Court for the Middle District of Florida in a case following *Farinas*, in order to satisfy the Florida good faith requirements, the insurer must:

> (1) fully investigate all claims arising from a multiple claim accident; (2) seek to settle as many claims as possible within the policy limit; (3) minimize the magnitude of possible excess judgments against the insured by reasoned claim settlement; and (4) keep the insured informed of the claim resolution process.

*Gen. Sec. Nat'l Ins. Co. v. Marsh*, 303 F.Supp.2d 1321, 1325 (M.D.Fla.2004) (citing *Farinas* and *Harmon v. State Farm Mut. Auto. Ins. Co.*, 232 So.2d 206 (Fla. 2d DCA 1970)).

In the instant case, Smart School has responded to TIG's motion for summary

judgment by pointing to only two facts which it claims are probative of TIG's bad faith: (1) TIG knew of J.J.'s claims before the A.N. settlement proposal was submitted to the district court for its approval; and (2) TIG did not inform Smart School when it settled the A.N. lawsuit that TIG's position was that the $1 million single occurrence limit was applicable to both claims. Assuming the truth of these contentions, as the Court must because Smart School is the non-moving party, no reasonable juror could find from these two facts alone that TIG breached its duty of good faith to the Smart School. It simply does not follow from these facts that TIG failed to fully investigate both sets of claims, that TIG failed to seek to settle both claims within the policy limits, that TIG failed to minimize Smart School's exposure to an excess judgment, or that TIG failed to keep Smart School informed of the claim resolution process. Therefore, TIG is entitled to the entry of summary judgment on Smart School's bad faith claim.

## V. CONCLUSION

Accordingly, it is hereby

ORDERED and ADJUDGED that TIG's Motion for Summary Judgment is GRANTED as follows:

(1) Any and all allegations of sexual abuse and negligent employment relating to the conduct of Curtis Gordon as alleged in both the A.N and J.J. lawsuits constitutes one occurrence under the TIG policies;

(2) The per-occurrence limit under the TIG policy is $1,000,000. The per-occurrence limit applies to all alleged acts of sexual abuse, regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual abuse or molestation took place;

(3) TIG's Motion for Summary Judgment regarding its obligation to defend or indemnify Smart School under the TIG's policies following payment of the remaining per-occurrence insurance limit is GRANTED. It is further

ORDERED and ADJUDGED that TIG's Motion for Summary Judgment on Smart School's Counterclaim II is GRANTED. It is further

ORDERED and ADJUDGED that Smart School's Motion for Summary Judgment and P.J.'s Cross Motion for Summary Judgment are DENIED. It is further

ORDERED and ADJUDGED that TIG's Motion to Strike P.J.'s Cross–Motion is GRANTED.