**AMERICAN COMMERCE INSURANCE BROKERS, INC., Respondent,**

v.

**MINNESOTA MUTUAL FIRE AND CASUALTY COMPANY, Petitioner, Appellant.**

No. C9–95–499.

Supreme Court of Minnesota.

July 18, 1996.

Jon A. Hanson, Margaret K. Ackerman, Hanson Lulic & Krall, Minneapolis, for Appellant.

Linda S. Jensen, Messerli & Kramer, P.A., Minneapolis, for Respondent.

## OPINION

ANDERSON, Justice.

At issue in this appeal is whether the phrase "series of related acts" in a business insurance policy is ambiguous and, if it is not ambiguous, how many "occurrences" arose under the policy. Minnesota Mutual Fire and Casualty Company seeks review of a Minnesota Court of Appeals decision holding that the phrase "series of related acts" in an insurance policy with its insured, American Commerce, was ambiguous. Because that phrase was held ambiguous, the court of appeals declined to determine how many occurrences arose under the policy and remanded the case to the district court for a determination of American Commerce's reasonable expectation of insurance coverage for business losses caused by an employee who embezzled over $190,000 from American Commerce. We reverse and hold that the phrase "series of related acts" is not ambiguous and conclude that two occurrences arose under the insurance policy.

In 1992, respondent American Commerce Insurance Brokers, Inc. submitted a claim to appellant Minnesota Mutual Fire and Casualty Company for losses caused by employee

embezzlement. During the period of embezzlement, American Commerce was insured under a Minnesota Mutual business insurance policy which provided coverage for losses resulting from employee dishonesty. The employee dishonesty coverage clause in the policy read as follows:

4. Employee Dishonesty

    a. We will pay for direct loss of or damage to Business Personal Property, including money and securities, resulting from dishonest acts committed by any of your employees * * *.

    c. The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Employee Dishonesty shown in the Declarations.

    **d. All loss or damage:**

    (1) Caused by one or more persons; or

    (2) **Involving** a single act or **series of related acts; is considered one occurrence.**

(Emphasis added.)

At all times relevant to this appeal, American Commerce was an insurance agency specializing in obtaining liability insurance for taxicab owners and operators. American Commerce's customers often came directly to its office, filled out the necessary paperwork, and made premium payments on the spot. The customers frequently paid the premiums by cash[1] or cashier's check rather than a business or personal check. American Commerce would then deposit the customer's payment in its own account and forward the customer's insurance application to the insurance carrier, together with American Commerce's check in payment of the premium.

After an internal investigation, American Commerce determined that one of its employees, Christee Lee Hartse, had embezzled over $190,000 between January 1, 1991 and February 1, 1992.[2] Hartse's job duties included customer service and general bookkeeping. She was responsible for accepting insurance applications and payments from taxicab owners and operators and for forwarding the applications and payments to the appropriate insurance carrier. Her bookkeeping duties included preparing daily deposit slips, handling deposits, preparing payroll and other checks for signatures by authorized signers, and maintaining computerized financial records.

Hartse's position provided her with direct access to American Commerce's cash receipts and with ample opportunity to embezzle. Hartse embezzled by accepting cash payments for premiums from customers who purchased new or renewed insurance policies. She would advise those customers who did not have checking accounts that she could accept cash payments for premiums and that the premiums would be forwarded to the appropriate insurance company. She would then take the cash payments and convert them to her own use. Hartse also instructed at least three customers to leave the payee line blank when writing checks for payment of insurance. She then completed the checks, making them payable to her rather than the insurance carrier. She subsequently endorsed and negotiated the checks at a bank, converting the funds received to her own use. Hartse embezzled $179,201 by taking funds received from customers as insurance premiums.

Hartse also embezzled by issuing unauthorized checks to herself. In addition to receiving her semi-monthly payroll checks, Hartse caused additional payroll checks to be made payable to her in precisely the amount of her semi-monthly payroll checks. Pursuant to this scheme, Hartse issued nine unauthorized payroll checks between 1991 and 1992. The unauthorized payroll checks totalled $7,443. Hartse also issued eight unauthorized petty cash checks payable to her from American Commerce's checking account between April 1991 and January 1992, totalling $6,000. Hartse embezzled approximate-

---

1. Because many of American Commerce's customers did not have checking accounts and dealt exclusively in cash, an estimated 60 to 70 percent of American Commerce's premium payments were in cash.

2. In a separate action, judgment against Hartse has been entered in Hennepin County District Court in the amount of $192,644.36.

ly $13,443 from American Commerce by issuing unauthorized checks to herself.

After discovering Hartse's embezzlement, American Commerce submitted a claim to Minnesota Mutual under its employee dishonesty coverage for the losses caused by Hartse's embezzlement. American Commerce's employee dishonesty coverage provided for $10,000 in coverage for each occurrence, subject to a $250 deductible per occurrence. After American Commerce submitted its claim, Minnesota Mutual tendered payment of the $10,000 coverage limit to American Commerce, based on Minnesota Mutual's position that Hartse's acts of embezzlement constituted only one occurrence. Finding the tendered payment insufficient, American Commerce brought suit against Minnesota Mutual, alleging that Hartse's acts were multiple occurrences because they were not related, or in the alternative, that the insurance provision defining occurrence as a "series of related acts" was ambiguous, and thus must be construed in favor of American Commerce. After discovery and the filing of cross-motions for summary judgment, Minnesota Mutual changed its position by conceding that Hartse had employed not one, but two distinct methods of embezzlement. In its order, the district court noted that it was "undisputed" that Hartse used two methods: pocketing payments received as insurance premiums, embezzling $179,201.30 by this method, and issuing unauthorized payroll checks and petty cash checks to herself, embezzling $13,-443.06 by this method. The court also defined the meaning of occurrence in the policy, stating that:

> In the context of employee dishonesty, an occurrence is a number of dishonest things done by an employee which follow one another in time and are connected to each other in some manner. * * * Ms. Hartse's series of dishonest acts are related because they are connected to one another by time, place, opportunity, and modus operandi.

Based on this conclusion, the court ordered Minnesota Mutual to pay American Com-

merce $20,000 for losses caused by two occurrences.[3]

American Commerce appealed to the court of appeals, which reversed. *American Commerce Ins. v. Minnesota Mut. Fire & Casualty Co.*, 535 N.W.2d 365 (Minn.App.1995). The court of appeals held that the phrase "series of related acts" in the insurance policy was ambiguous and remanded the case to the district court for a determination of what would constitute American Commerce's reasonable expectation of coverage in the circumstances presented by this case. *Id.* at 371–72. Minnesota Mutual appeals, arguing that the phrase "series of related acts" is not ambiguous and that the court of appeals erred in remanding to the district court the issue of American Commerce's reasonable expectations under the insurance policy.

## I.

■ On appeal from summary judgment, this court must address two questions: (1) whether there are any genuine issues of material fact, and (2) whether the lower courts erred in their application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn. 1990). The question of whether ambiguity exists in an insurance policy is one of law which this court reviews de novo. *Hammer v. Investors Life Ins. Co.*, 511 N.W.2d 6, 8 (Minn.1994).

■ The language of an insurance policy will be held ambiguous only if it is reasonably subject to more than one interpretation. *Columbia Heights Motors v. Allstate Ins. Co.*, 275 N.W.2d 32, 34, 36 (Minn.1979). If an ambiguity exists, the court construes the language against the insurer. *Id.* However, the court must "fastidiously guard against the invitation to 'create ambiguities' where none exist." *Columbia Heights Motors*, 275 N.W.2d at 36 (citing *Farkas v. Hartford Acc. & Indem. Co.*, 285 Minn. 324, 173 N.W.2d 21 (1969)). If no ambiguity exists, there is no reason for construction, and the court is bound to attribute the usual and accepted

---

**3.** No mention is made of the $250 deductible per occurrence by the district court, the court of appeals, or the parties in their respective briefs to this court.

meaning to the phrase. *Bobich v. Oja*, 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960).

Minnesota Mutual argues that the phrase "series of related acts" is clear and unambiguous. It argues that this phrase is intended to encompass a continuous embezzlement scheme in which the dishonest employee converts funds from an employer by a common scheme or series of related acts on a constant basis. American Commerce counters by arguing that the phrase is ambiguous. Further, it maintains that separate, discrete, wrongful acts should not be deemed part of a "series of related acts" if, as in this case, they occur on separate occasions, in separate transactions, and each results in a separate, measurable loss to the insured.

The issue of whether the phrase "series of related acts" as used in an insurance policy providing coverage for employee dishonesty is ambiguous is an issue of first impression for this court. Minnesota Mutual cites cases from two foreign jurisdictions in support of its argument that the phrase "series of related acts" is clear and unambiguous. *See Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993); *Gregory v. Home Ins. Co.*, 876 F.2d 602 (7th Cir.1989).

In *Bay Cities*, a case involving a legal malpractice action brought against an attorney, the California Supreme Court held that the word "related" in the phrase "series of related acts" is not ambiguous. *Id.* at 702, 855 P.2d at 1274. The court noted that although "related" is a commonly used word with a broad meaning which encompasses a myriad of relationships, multiple or broad meanings do not necessarily create ambiguity. *Id.* at 699, 855 P.2d at 1271. The court determined that "related" encompasses both logical and causal connections. *Id.* at 702, 855 P.2d at 1274. However, the court cautioned that the word "related" does not encompass every conceivable logical relationship. A relationship between two claims might be "so attenuated or unusual that an objectively reasonable insured could not have expected that they would be treated as a single claim under the policy." *Id.* at 703, 855 P.2d at 1275. Under either the logical or causal connections "tests," the court conclud-

ed that the attorney's failure to file a complaint to foreclose a mechanic's lien and to serve a stop notice on construction project's construction lenders were related in multiple respects because they arose out of the same transaction, were committed by the same attorney, and resulted in the same injury. *Id.*

In *Gregory*, the Seventh Circuit held that the phrase "series of related acts" in a professional liability policy's limit of liability provision was not ambiguous. 876 F.2d at 605. As in *Bay Cities*, the *Gregory* court noted that the word "related" covers a broad range of connections, both causal and logical, but cautioned that at some point "a logical connection may be too tenuous reasonably to be called a relationship." *Id.* at 606. Under either the logical or causal connection "tests," the court concluded that the different aspects of the attorney's work in this case (tax and securities advice, drafting of a promissory note, production service agreement and opinion letter embodying that advice) were " 'related' in any meaningful sense of the term." *Id.*

■■ As stated in *Gregory*, the common understanding of the word "related" covers a very broad range of connections, both logical and causal. 876 F.2d at 606. We cannot so restrict the plain and ordinary meaning of the word "related" such that acts of embezzlement which follow each other in time, take place at the same business, and are committed by the same employee are not "related" as that word is commonly used. Rather, the phrase "series of related acts" is intended to encompass a continuous embezzlement scheme in which the dishonest employee converts funds from an employer by a common scheme on a constant basis. The relationship between Hartse's acts of embezzlement is not so "attenuated or unusual" that American Commerce could not have expected that the acts would be treated as somehow being related. *See Bay Cities*, 21 Cal.Rptr.2d at 703, 855 P.2d at 1275; *Gregory*, 876 F.2d at 606. We therefore conclude that the phrase "series of related acts" as used in the policy in this case is not ambiguous.

## II.

We next consider how many occurrences arose as part of a "series of related acts" of embezzlement in the present case. Minnesota Mutual argues that Hartse's acts of embezzlement constitute two "series of related acts" because a common methodology or modus operandi can be discerned in Hartse's conduct. American Commerce counters that if modus operandi is determinative, Hartse used not two, but at least seven, identifiable methods. American Commerce argues in the alternative that modus operandi is not determinative, and that Hartse's acts relate to each other only if they are meaningfully connected in time and place to a loss of insured property. American Commerce argues that under this most expansive definition of occurrence, 155 occurrences arose because 155 separate and discrete losses of insured property occurred.

The parties thus present us with three options: 155 occurrences, 7 occurrences or 2 occurrences. We consider each option in descending numerical order.

The case that best supports American Commerce's position that 155 occurrences arose is *Slater v. United States Fidelity and Guar. Co.,* holding that each act of embezzlement by a receptionist over a fifteen-month period was a separate occurrence. 379 Mass. 801, 400 N.E.2d 1256, 1261–62 (1980). In *Slater,* the Massachusetts Supreme Judicial Court noted that cases in this area turn on three factors: causation, the resulting event or events (particularly the time and distance which separate them), and the subject matter of the insurance policy. *Id.* 400 N.E.2d at 1259. The *Slater* court observed that if there is one, uninterrupted proximate cause which results almost immediately in more than one impact or event, courts generally find there is one accident or occurrence. *Id.* An example would be a car that goes out of control and kills three motorcyclists, because one negligent act is the proximate cause of all three injuries. *Id.* at 1259–60 (citing *Truck Ins. Exch. v. Rohde,* 49 Wash.2d 465, 303 P.2d 659 (1956)). On the other hand, when the cause is interrupted, either by an independent cause or by the actor gaining control over the causing factor, courts usually find that there is more than one occurrence or accident. *Id.* 400 N.E.2d at 1260. Examples include a defective forklift truck that damaged several appliances over a nine-month period and a pipe-laying project that caused damage to various houses at different times over the course of more than a year. *Id. (citing Elston–Richards Storage Co. v. Indem. Ins. Co.,* 194 F.Supp. 673 (W.D.Mich. 1960), *aff'd,* 291 F.2d 627 (6th Cir.1961); *Lombard v. Sewerage & Water Bd.,* 284 So.2d 905 (La.1973)).

Using this analytical framework, the *Slater* court concluded that:

> although the receptionist may have taken the money pursuant to a common scheme, each act of appropriating money for her own use necessarily was preceded by a decision to adhere to and effectuate that scheme, which could have been interrupted at any time before the $9,000 was taken. The scheme, without more, could not have caused the losses.

*Id.,* 400 N.E.2d at 1261. American Commerce urges us to adopt the reasoning in *Slater* and to treat each of the 155 losses of insured property that American Commerce suffered as a separate occurrence.

We decline to do so. *Slater* has not been adopted by any other court considering insurance coverage in the embezzlement context. Further, American Commerce's position is problematic for at least two other reasons. The first is one of public policy, and can be illustrated by way of a hypothetical. Assume an employee embezzles $100 from a company on 155 separate occasions for a total embezzlement of $15,500. Further assume that, as in this case, the deductible for the insurance policy is $250 and the coverage limit $10,000 for each occurrence. If all 155 acts constitute one occurrence because they are part of a "series of related acts," the insurance company would pay $10,000. However, if we were to adopt American Commerce's position and determine that 155 occurrences arose, the insurance company would pay nothing because the monetary value of each act of embezzlement would be lower than the deductible. Thus, while adopting American Commerce's expedient definition of occurrence would benefit Ameri-

can Commerce in this case, it might well have a deleterious effect on the insurance industry as a whole. Future insureds would be harmed if, as often occurs in cases of petty employee theft, embezzlers steal in amounts below the deductible. The approach adopted in *Slater* is thus problematic as a matter of public policy.

We also decline to adopt American Commerce's interpretation that 155 occurrences arose because such an expansive interpretation of the phrase "series of related acts" would be unreasonable under the policy. Under American Commerce's interpretation, an insured could receive $10,000 for each separate act of embezzlement, without limit. The record reflects that its total premium for business protection, which included coverage for business personal property and data processing equipment, in addition to coverage for employee dishonesty, was $563 per year. We conclude that American Commerce's interpretation would allow a potentially unlimited windfall of recovery and is simply incommensurate with the $563 per year premium under the policy.

We next turn to American Commerce's argument that Hartse's acts of embezzlement constitute seven occurrences. American Commerce argues that the two main methods of embezzlement—taking funds received from customers as insurance premiums and issuing unauthorized checks—should be broken down further into seven methods. For example, American Commerce argues that issuing unauthorized payroll checks, petty cash checks and filling in her own name as payee on customer checks should constitute three "different" methods of embezzlement for occurrence purposes. American Commerce also argues that accepting cash payment of premiums, instructing customers to leave the payee line blank when writing their personal or cashier checks, advising customers that cash payments could be accepted, and instructing customers to pay in cash should be considered four different methods for occurrence purposes. We conclude that

this type of micro-distinguishing of related acts subverts the purpose of the phrase "series of related acts" and is inconsistent with the interpretation of "series of related acts" we adopt below.

We next consider Minnesota Mutual's argument that Hartse's acts of embezzlement constitute two occurrences. Minnesota Mutual posits that the specific character of employee embezzlement and the policy behind employee dishonesty coverage warrant a determination that no more than two occurrences arose in this case. Minnesota Mutual points out that in most embezzlement schemes, the dishonest employee will continue to convert funds from its employer by employing a common scheme or series of related acts on a constant basis. Because it is relatively uncommon for a dishonest employee to embezzle only once and then stop,[4] the phrase "series of related acts" is intended to encompass a continuous embezzlement scheme and to limit the amount of coverage accordingly. The case that best supports Minnesota Mutual's position is *Business Interiors, Inc. v. Aetna Casualty and Sur. Co.*, where the Tenth Circuit held that the embezzlement of funds by writing 40 separate checks, 31 of which were forgeries and 9 of which were material alterations of the original instruments, was a continuing course of dishonesty, and thus considered one occurrence under the terms of a fidelity policy. 751 F.2d 361, 363 (10th Cir.1984). In *Business Interiors*, the court adopted a "cause test," in which an occurrence is determined by the cause or causes of the resultant injury. Because the cause of the company's loss was the continued dishonesty of one employee, each new embezzlement was construed as an attempt to continue the dishonesty, not as an attempt to commit an entirely new and different act of dishonesty. *Id.*

Minnesota Mutual views *Business Interiors* as directly analogous to this case because American Commerce's losses were similarly caused by the "continued dishonesty of one

---

4. *See, e.g., Slater*, 379 Mass. 801, 400 N.E.2d 1256 (insured's loss of $9,000 the result of employee's theft of sums of less than $250 on each of many occasions); *PECO Energy Co. v. Boden*, 64 F.3d 852 (3rd Cir.1995) (numerous thefts of fuel oil taking place over several years); *Howard, Weil, Labouisse, Friedrichs, Inc. v. Insurance Co. of N. Am.*, 557 F.2d 1055 (5th Cir.1977) (trader made numerous trades and wrote two bad checks).

employee," Hartse. A strict application of *Business Interiors* would suggest that only one occurrence arose in the present case because Hartse "caused" all acts of embezzlement. However, we find this interpretation of *Business Interiors* to be unduly restrictive. *Business Interiors* can be distinguished because it involved a single method of embezzlement (forging checks), and not two distinct methods of embezzlement as in the present case. We read *Business Interiors* to conclude that two occurrences may arise where one employee commits two "series of related acts" of embezzlement.

 While we find *Business Interiors* instructive, we do not adopt the "cause" test developed in that case. Rather, we hold that a court may consider several factors in concluding whether dishonest acts are part of a "series of related acts," including whether the acts are connected by time, place, opportunity, pattern, and, most importantly, method or modus operandi. Under this interpretation, each of Hartse's acts of issuing of unauthorized checks to herself forms part of one "series of related acts" for coverage purposes. These acts of embezzlement by Hartse follow each other in time and occurred at American Commerce's place of business while Hartse was at her job and during business hours. Most importantly, Hartse repeatedly embezzled using the same method: issuing unauthorized payroll checks to herself.

Similarly, each of Hartse's acts of taking of funds received from customers as insurance premiums forms part of one "series of related acts" for coverage purposes. Hartse's acts of embezzlement followed each other in time, occurred at American Commerce's place of business while Hartse was at her job and during business hours, and, most importantly, Hartse repeatedly embezzled using the same method: taking funds received from customers as insurance premiums. We conclude as a matter of law that two occurrences arose under the circumstances of this case. Because we conclude that two occurrences arose under the policy, remand is not necessary to determine the reasonable expectations of the insured.

Reversed.