# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1986
_____

Crystal D. Kilcher; Daniel J. Kilcher; Anthony C. Muellenberg; Anthony C. Muellenberg, as Trustee of the Troy D. Muellenberg 2007 Revocable Trust

*Plaintiffs - Appellees*

v.

Continental Casualty Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: December 17, 2013
Filed: April 3, 2014

_____

Before WOLLMAN, LOKEN, and KELLY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Continental Casualty Company (Continental) appeals from the district court's grant of summary judgment to Crystal Kilcher, Daniel Kilcher, and Anthony Muellenberg, individually and as trustee of the Troy Muellenberg revocable trust (collectively, Plaintiffs). The district court determined that the Plaintiffs had made more than one claim against their former financial advisor, who was insured by

Continental under a professional liability insurance policy. Accordingly, the district court held that the insurance policy's $1 million coverage limit for a single claim did not apply and that the Plaintiffs' claims instead triggered the insurance policy's aggregate coverage limit of $2 million. We reverse.

## I. Background

### A. Factual Background

Crystal Kilcher, Daniel Kilcher, Anthony Muellenberg, and Troy Muellenberg are siblings and members of the Shakopee Mdewakanton Sioux Community (Community).[1] Members of the Community become eligible to share in the profits generated by the Community's gaming enterprise when they turn eighteen years old. Anthony testified that he received an annual distribution of approximately $1 million in 2003 and that the distribution has decreased each year since then. Between 1999 and 2003, after each Plaintiff turned eighteen, their mother introduced them to Helen Dale, a financial advisor and registered agent of Transamerica Financial Advisors, Inc. (TFA). Crystal, the oldest sibling, began investing with Dale in 1999, followed by Daniel in 2000, and twins Anthony and Troy in 2003.

Dale gave similar advice to each Plaintiff, recommending the purchase of whole life insurance policies and fixed annuities. At age eighteen, each Plaintiff purchased a $10 million whole life insurance policy at Dale's direction. The premiums for those policies ranged from $5,000 to $6,000 per month. Crystal and Daniel later purchased millions of dollars of whole life insurance on their spouses, as well as $1 million whole life insurance policies on each of their children. Heeding

---

[1]We note that Troy died in 2009 and that his trust is a party to this action. We will refer to the siblings collectively as Plaintiffs. Consistent with the Plaintiffs' briefs and in the interest of clarity, we will use the siblings' first names.

Dale's advice, Crystal and Troy purchased supplemental insurance policies that covered living expenses in the event that they became unable to work due to sickness or injury. Dale recommended the supplemental insurance product, even though the Plaintiffs' primary source of income was the distribution they received from the Community. Similarly, Dale recommended that Daniel purchase certain riders to his life insurance policy that provided benefits that the Community would have provided at no charge.

Each Plaintiff also invested in various annuities that were subject to surrender charges if funds were withdrawn before the annuity matured. According to the Plaintiffs' deposition testimony, the money invested in the annuities was inaccessible and generated little interest, while the annuities charged high fees and were ill-suited for the Plaintiffs' investment goals. For example, when Daniel needed funds to complete the remodeling of his home, he surrendered certain annuities and paid the fees associated with doing so. Despite Daniel's need for liquidity at that time, Dale nonetheless purchased more of the same kind of annuities for him, an action Daniel believes constituted churning by Dale.[2]

The Plaintiffs continued to purchase insurance products from and continued to make investments through Dale until mid-2007, when a financial advisor reviewing Anthony's portfolio discovered that his investments were unsuitable for his age, background, and investment goals. The Plaintiffs then discovered that their portfolios were similarly unsuitable for their respective situations.

---

[2]We have said that "'[c]hurning' occurs when a broker, directing the volume and frequency of trades, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account and the customer's objectives as expressed to the broker." Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 906 F.2d 1206, 1211 n.3 (8th Cir. 1990).

## B. Procedural Background

In December 2007, the Plaintiffs filed individual claims against Dale and TFA with the Financial Industry Regulatory Authority (FINRA). They alleged, among other things, that Dale had breached the fiduciary duty she owed to them, that she had misrepresented the nature of the investments, and that she had sold them unsuitable investments. The Plaintiffs alleged that the investments were unsuitable because they were not sufficiently liquid, were subject to significant transaction costs, and had been sold to generate high commissions for Dale. The FINRA arbitration proceedings were consolidated by agreement of the parties. In July 2008, the arbitration panel determined that certain claims were ineligible for submission and dismissed other claims. The Plaintiffs eventually withdrew their claims from arbitration.

In March 2008, each Plaintiff served Dale and TFA with complaints for lawsuits venued in state district court. In August 2008, the Plaintiffs filed a joint amended complaint against Dale and TFA in Hennepin County District Court. The amended complaint alleged claims of churning, breach of fiduciary duty, unsuitability, misrepresentation, and violations of federal and state securities laws. The action was later dismissed. In December 2009, the Plaintiffs filed one lawsuit in Scott County District Court. They alleged six counts against Dale: breach of fiduciary duty, unsuitability, negligent misrepresentation, fraudulent misrepresentation, fraud, and violations of state securities laws.[3]

Dale moved for summary judgment, and the Plaintiffs moved for partial summary judgment. In support of their motion, the Plaintiffs submitted expert

---

[3]According to the Scott County District Court's order, the Plaintiffs and TFA settled their dispute while the motions for summary judgment were pending.

-4-

evidence.[4]  Their expert opined that the investments recommended by Dale were unsuitable and that Dale had failed to act in the Plaintiffs' best interests.  The expert explained that the $10 million whole life insurance policies were inappropriate because the Plaintiffs had no dependents when they purchased the policies.  The policies thus offered little benefit to the Plaintiffs and came at a substantial cost to them, by way of pricey premiums and fees.  According to the expert, term life insurance policies would have been more suitable because such policies would have been less expensive and would have offered more flexibility.  The sale of whole life insurance policies generated a higher commission for Dale, however, than the sale of term life insurance policies would have generated.  The expert further testified that the annuities Dale sold to each Plaintiff had significant surrender charges and policy expenses.  Moreover, Dale sold multiple contracts to each Plaintiff, rather than applying funds to their existing annuities, a practice that allowed Dale to generate additional commissions.  Ultimately, the expert opined that:

> [Dale] oversold the insurance products and failed to act in the Plaintiffs' best interests by focusing on individual product sales (which generated substantial commissions for the Defendants) while failing to employ proper asset allocation and product diversification techniques.  This caused the Plaintiffs to struggle with liquidity issues, frustration with administrating the large number of individual products, higher commissions and internal investment expenses than otherwise should have been paid, failed to adequately meet time horizon requirements, and led to poor financial outcomes.

Plaintiffs' accounting expert determined that the Plaintiffs had suffered distinct damages, together totaling almost $4 million.

---

[4]The summary of expert evidence that follows relies on both affidavits and deposition testimony.  It appears that the parties did not submit the deposition testimony to the Scott County District Court.

In January 2012, the Scott County District Court denied Dale's motion for summary judgment and granted, in part, Plaintiffs' motion. It held that Dale owed a fiduciary duty to the Plaintiffs, but it did not decide whether Dale had breached that duty. In May 2012, the parties entered into a settlement agreement, wherein Continental agreed to pay $1 million under the policy, less Dale's defense costs, and the Plaintiffs agreed to dismiss with prejudice the action against Dale that was pending in Scott County. The parties entered into the functional equivalent of a Miller-Shugart agreement,[5] the terms of which provided that Continental had satisfied all claims that Plaintiffs had or may have had against Dale.

The settlement agreement did not decide whether the Plaintiffs had submitted one claim under the insurance policy or more than one claim. The settlement agreement thus permitted the Plaintiffs to file a declaratory judgment action against Continental so that the federal district court could decide the issue, which the settlement agreement framed as follows: "Whether Plaintiffs' claims against Dale involve the same 'Wrongful Acts' and/or 'Interrelated Wrongful Acts' as defined by the Policy." If the Plaintiffs prevailed and the district court held that they had submitted more than one claim, Continental agreed that it would pay an additional $1 million, the aggregate policy limit.

### C. The Insurance Policy and the District Court's Order

For the period from January 1, 2008, to January 1, 2009, Dale was insured by Continental under a Life Agent/Broker Dealer Solutions Policy (the Policy). The

---

[5] Miller v. Shugart provides that in some circumstances, "the insured may enter into a settlement agreement with the claimant subject to the condition that the claimant will only sue for the insurance proceeds to enforce the settlement." Bob Useldinger & Sons, Inc. v. Hangsleben, 505 N.W.2d 323, 325 n.2 (Minn. 1993) (citing Miller v. Shugart, 316 N.W. 2d 729 (Minn. 1982)).

Policy was a claims-made policy, meaning that it provided coverage for loss resulting from "a Claim" first made and reported during the Policy period for "a Wrongful Act" in the rendering or failing to render professional services. Dale notified Continental of the FINRA arbitration proceedings by correspondence dated January 3, 2008.[6] The Policy provided a maximum of $1 million in coverage per claim, with an aggregate limit of $2 million.

The only issue in this case is whether the Plaintiffs submitted more than one claim against Dale. Under the Policy, "Claim" means:

a.    a written demand for monetary damages, or
b.    a civil adjudicatory or arbitration proceeding for monetary damages,

against an Insured for a Wrongful Act, including any appeal therefrom brought by or on behalf of or for the benefit of any Client.

The Policy further provides that "[m]ore than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be considered as one Claim[.]" The Policy defines Interrelated Wrongful Acts as "any Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." A Wrongful Act, in turn, means "any negligent act, error or omission of . . . the Insureds in rendering or failing to render Professional Services."

The district court held that the relevant policy language was not ambiguous and that the Plaintiffs had submitted more than one claim against Dale. The district court acknowledged that some of the Plaintiffs' claims were similar, but ultimately determined that the "Plaintiffs' claims are not 'Interrelated Wrongful Acts' as the

---

[6]The parties do not dispute that the Policy applies, even though the Plaintiffs filed their FINRA claims in December 2007.

Policy defines that term. . . . Plaintiffs have parallel claims which do not necessarily connect with each other." D. Ct. Order of Apr. 1, 2013, at 11-12. The district court relied on the following facts to conclude that the Plaintiffs had submitted more than one claim: that each Plaintiff met with Dale separately, formed a unique relationship with Dale, and invested individually; that each Plaintiff invested different amounts and that not all Plaintiffs purchased the same policies or annuities; that Daniel presented a churning claim, while the other Plaintiffs did not; that each Plaintiff suffered losses in different amounts; and that each Plaintiff "would have to present his or her own evidence to carry their respective burdens of proof." Id. at 14.

The district court determined that the Plaintiffs had stated at least two separate claims because "Dale's wrongful acts included selling insurance policies but also unsuitable annuities; more broadly speaking, the wrongful acts claims involved selling unsuitable investments but also churning." Id. at 15.

> To find that Plaintiffs' claims are causally or logically connected only by reason of Dale's desire to generate commissions pushes the Policy's language to unreasonable extremes. Absent such broad generalizations, however, Continental cannot identify a single action, decision, or other fact that reasonably encompasses, connects, or gives rise to all of Plaintiffs' claims.

Id. at 17.

On appeal, Continental argues that the district court erred in finding no logical connection among the Plaintiffs' claims. It contends that the Plaintiffs' decision to join their claims in a single action "compels the conclusion that their claims share sufficient connections to deem them one Claim under the Policy." Appellant's Br. 25. Moreover, it argues that Dale allegedly breached the fiduciary duty she owed to each Plaintiff in substantially the same way. Given the shared attributes of the

Plaintiffs' claims and the commonalities among the Plaintiffs themselves, Continental's argument goes, the claims were logically connected and thus constituted only one claim under the Policy.

## II.  Analysis

We review *de novo* the district court's grant of summary judgment.  W3i Mobile, LLC v. Westchester Fire Ins. Co., 632 F.3d 432, 436 (8th Cir. 2011).  The parties agree that there exists no material factual dispute, that Minnesota law governs our interpretation of the Policy, and that the Policy's language is unambiguous.  Accordingly, we must give the Policy its plain and ordinary meaning and decide whether the Plaintiffs submitted one claim or more than one claim.  See Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 880 (Minn. 2002) ("When the language of an insurance contract is unambiguous, it must be given its plain and ordinary meaning.").

On appeal, Continental frames the issue as whether the Plaintiffs' four claims—one for each Plaintiff—involve interrelated wrongful acts.  Continental argues that we should group Dale's wrongful acts by Plaintiff and then determine whether there exists a logical connection between the set of wrongful acts each Plaintiff has alleged.  The Plaintiffs argue that Continental has ignored the Policy's language that defines the term "Claim" to be "a Wrongful Act."  According to the Plaintiffs, one wrongful act constitutes one claim and each Plaintiff has alleged more than one wrongful act and thus has submitted more than one claim.

As relevant to this case, a Claim is "a civil adjudicatory . . . proceeding" against the insured for "a Wrongful Act" brought by "any Client."  Continental interprets the Policy to limit each client to only one claim brought in their joint civil adjudicatory proceeding.  The Policy, however, does not refer to wrongful acts or to interrelated wrongful acts in its definition of claim.  Instead, the Policy explains in a different

section that "[m]ore than one Claim involving . . . Interrelated Wrongful Acts shall be considered as one Claim[.]"  We thus decline to read the Policy as categorically limiting each Plaintiff to one claim.  Accordingly, to determine whether the Plaintiffs have submitted more than one claim, we must consider Dale's wrongful acts and decide whether they constitute interrelated wrongful acts.

The Plaintiffs argue that they have submitted more than one claim because Dale committed more than one wrongful act.  Although the Plaintiffs have not enumerated exactly how many different wrongful acts Dale committed, they set forth in their brief a table that lists claims based on $10 million whole life insurance policies, life insurance on children, life insurance on spouses, supplemental insurance policies, annuities, and churning.  They contend that "the improper sale of whole life insurance policies . . . has nothing to do with improper sale of fixed annuities" and that offering unsuitable investments is separate from a claim for churning.  Appellees' Br. 53.  For its part, Continental did not list each of Dale's wrongful acts, focusing instead on the similarities of the Plaintiffs and their proceedings against Dale.

The Minnesota Supreme Court has not considered policy language defining the term "Interrelated Wrongful Acts" as Continental's policy does, but we find instructive its interpretation of the word "related" set forth in American Commerce Insurance Brokers, Inc. v. Minnesota Mutual Fire and Casualty Co., 551 N.W.2d 224 (Minn. 1996).  In that case, an employee had engaged in 155 acts of embezzlement, either by issuing unauthorized checks to herself or by taking the funds customers had paid for their insurance premiums.  The employer filed a claim with its insurer, which provided coverage for losses resulting from employee dishonesty.  The policy provided for $10,000 in coverage for each occurrence, with a "series of related acts" constituting one occurrence.  The court defined the word "related" as "cover[ing] a very broad range of connections, both logical and causal."  Id. at 228.  It held that "a court may consider several factors in concluding whether dishonest acts are part of

a 'series of related acts,' including whether the acts are connected by time, place, opportunity, pattern, and, most importantly, method or modus operandi." Id. at 231. While the opinion warned against "micro-distinguishing[,]" id. at 230, it likewise cautioned that "at some point 'a logical connection may be too tenuous reasonably to be called a relationship[,]'" id. at 228 (quoting Gregory v. Home Ins. Co., 876 F.2d 602, 606 (7th Cir. 1989)). The court ultimately concluded, as a matter of law, that two occurrences arose under the circumstances of the case because the employee had embezzled money via two distinct methods.

The Policy adopted American Commerce's definition of the term "related," in that it requires a logical or causal connection for wrongful acts to be interrelated. The Policy's language, however, is even broader, in that wrongful acts are interrelated if they are logically related "by reason of *any* common fact, circumstance, situation, transaction or event." (emphasis added). Plaintiffs' claims share the fact that the wrongful acts were committed by Dale, whose motive was to generate commissions. Dale's wrongful acts, in turn, are logically related by reason of the following common facts and circumstances. Each Plaintiff presented the same opportunity to Dale: a young, unsophisticated investor who began earning a significant income and whose mother had introduced Dale as a financial advisor. As time passed and each Plaintiff's relationship with Dale grew, the Plaintiffs continued to present the same opportunity to Dale: an investor who trusted Dale to act in his or her best interest. Dale also engaged in the same method or modus operandi, advising each Plaintiff to purchase unsuitable whole life insurance policies and unsuitable annuities.

Plaintiffs urge us to hold that the acts of selling whole life insurance policies to the Plaintiffs are not related to the acts of selling whole life insurance policies to Crystal and Dan for their children and spouses or to the acts of selling supplemental insurance policies to Crystal and Troy. We conclude that doing so, however, would constitute the type of "micro-distinguishing" the Minnesota Supreme Court warned

would "subvert[] the purpose of the phrase 'series of related acts[.]'" Am. Commerce Ins. Brokers, Inc., 551 N.W.2d at 230. We also conclude that the offering of unsuitable investments is logically connected to the churning claim, which resulted from Dale's advice that Daniel purchase inappropriate annuities, while she simultaneously liquidated similarly inappropriate annuities on Daniel's behalf.

The Plaintiffs dispute that the commonalities between their claims constitute a meaningful logical connection, but as they were seeking to establish their breach of fiduciary duty claim against Dale in Scott County District Court, they argued that Dale took advantage of the same opportunity with each Plaintiff and had engaged in the same pattern of deception with each Plaintiff:

> [Plaintiffs] have provided testimony regarding how they came to Dale at 18, financially uneducated; that Dale convinced them to invest in certain products; that they invested in those products because of their implicit trust in Dale; that Dale lied to them about how she would be paid, and deceived them regarding the penalties attached to their annuities; and that they discovered in May of 2007 . . . that Dale's investments were extremely unsuitable—but unsurprisingly, extremely commission-heavy.

Similarly, the Plaintiffs' expert opined that Dale had breached her fiduciary duty to the Plaintiffs in the same way, emphasizing the Plaintiffs' youth, lack of sophistication, and substantial annual income and net worth. Although Dale made different alleged misstatements, omissions, and promises on different dates to each Plaintiff, there nonetheless exists a logical connection between her wrongful acts.

We recognize that this is an unfavorable outcome for the Plaintiffs, who trusted Dale and to whom she owed a fiduciary duty. We are not sitting in judgment of Dale, however. We are charged instead with interpreting the language of Dale's professional liability insurance policy, which defined the term "Interrelated Wrongful

Acts" to mean acts that are "logically . . . connected by reason of any common fact [or] circumstance[.]"  That Dale harmed each Plaintiff individually and uniquely is not enough to overcome the Policy's broad language.

## III.  Conclusion

The judgment is reversed, and the case is remanded to the district court for entry of judgment in favor of Continental.

———————————————————