# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A24-1501

Life Time, Inc., et al.,
Appellants,

vs.

Zurich American Insurance Company,
Respondent.

**Filed August 11, 2025**
**Reversed and remanded**
**Bentley, Judge**

Hennepin County District Court
File No. 27-CV-20-10599

Bryan R. Freeman, David E. Suchar, Erica A. Holzer, Maslon LLP, Minneapolis, Minnesota; and

Erik A. Lindseth, Christopher Ryan, Chanhassen, Minnesota (for appellants)

Akira Céspedes Gilheany, Dan Millea, Zelle LLP, Minneapolis, Minnesota; and

Patrick F. Hofer (pro hac vice), Courtney D. Logli, Clyde & Co US LLP, Chicago, Illinois (for respondent)

Considered and decided by Larkin, Presiding Judge; Bentley, Judge; and Cleary, Judge.[*]

## SYLLABUS

1.      Under an insurance policy providing "interruption by communicable disease" coverage for an insured's losses that are "caused by order of an authorized

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

governmental agency enforcing any law or ordinance regulating communicable diseases," governmental shutdown orders were the causes of the insured's losses for purposes of determining the number of occurrences under the policy, not the COVID-19 pandemic.

2. Under an insurance policy providing interruption by communicable disease coverage that defines an occurrence as all losses "attributable directly or indirectly to one cause or a series of similar or related causes," governmental shutdown orders issued by separate jurisdictions were not a "series," whereas governmental shutdown orders issued within one jurisdiction were a "series."

**OPINION**

**BENTLEY**, Judge

Appellant Life Time, Inc., operates health and fitness clubs across the United States, with 150 locations at the time this dispute arose. Like many businesses during the COVID-19 pandemic, Life Time was ordered to close its locations to the public for periods of time in 2020. But in anticipation that the spread of communicable diseases may impact its business, Life Time had secured a commercial-property insurance policy with respondent Zurich American Insurance Company that provides coverage for "interruption by communicable disease." The policy covers losses resulting from the suspension of business activities if the "[s]uspension is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases and that [sic] such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease[.]" That coverage is limited to $1 million per "[o]ccurrence," and

2

the policy defines an occurrence as "[a]ll loss(es) or damage that is attributable directly or indirectly to one cause or a series of similar or related causes."

The issues in this appeal are relatively narrow. There is no dispute that Life Time experienced losses that are covered by the policy. But the parties dispute the cause of Life Time's losses—the governmental shutdown orders or the pandemic itself—and that dispute fuels a disagreement over the number of occurrences that arose under the policy and that are subject to the coverage limit. The district court granted summary judgment for Zurich after determining that the COVID-19 pandemic caused Life Time's losses within the meaning of the policy and that, because Life Time's losses all stem from that one cause, there was only one occurrence.

Upon review of the policy language in this case, we disagree and conclude that the governmental orders, not the COVID-19 pandemic, are the causes of Life Time's losses for purposes of determining the number of occurrences subject to the coverage limit. We also conclude that governmental orders from separate jurisdictions do not constitute a "series" of similar or related causes, so Life Time's losses from separate jurisdictions may not be treated as one occurrence. But we conclude that the governmental orders issued within the same jurisdiction do constitute a "series" and, therefore, all losses that are attributable to orders in one jurisdiction may be treated as one occurrence.

We reverse the district court's order granting summary judgment in favor of Zurich and remand for further proceedings not inconsistent with this opinion.

**FACTS**

The following facts are derived from the summary-judgment record, which reveals no genuine issue of material fact as relevant to the issues on appeal.[1]

Life Time's insurance policy from Zurich includes "Interruption By Communicable Disease" (ICD) coverage. Life Time pursued this policy after it experienced incidents of measles at its locations and considered the business risks of other known communicable diseases like Ebola virus. The relevant policy period for purposes of this litigation extended from December 15, 2019, to December 15, 2020. The ICD endorsement provides:

> The Company [Zurich] will pay for the actual Gross Earnings loss sustained by the Insured [Life Time], as provided by this Policy, resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases and that [sic] such portions of the

---

[1] The parties filed much of the record, including their summary-judgment memoranda, under seal in the district court, citing a protective order issued by the court in relation to discovery. On appeal, the parties obtained leave to file separate public and nonpublic versions of their principal appellate briefs. *See* Minn. R. Civ. App. P. 112.05, subd. 3. Court records "are presumed to be open to any member of the public," unless there is a specific exception in the access rules. Minn. R. Pub. Access to Recs. of Jud. Branch 2; *see also* Minn. R. Pub. Access to Recs. of Jud. Branch 4, subd. 1 (identifying certain types of records not available to public, including case records that are made inaccessible to the public under Minn. R. Civ. App. P. 112). But materials filed as confidential in the district court remain nonpublic on appeal. Minn. R. Civ. App. P. 112.02, subd. 1. Still, we are not precluded "from mentioning the contents" of confidential or sealed documents when the information is "relevant to the particular issues or legal argument being addressed in the proceeding." Minn. R. Pub. Access to Recs. of Jud. Branch 4, subd. 4. Nor are we constrained from disclosing information contained in the publicly filed briefs. *See* Minn. R. Pub. Access to Recs. of Jud. Branch 4; *see also Coursolle v. EMC Ins. Grp., Inc.*, 794 N.W.2d 652, 655-66 n.1 (Minn. App. 2011) (discussing these rules under similar circumstances), *rev. denied* (Minn. Apr. 19, 2011). We limit our discussion in this opinion to information disclosed in publicly filed documents, and we express no opinion on the propriety of the access designations made by the district court.

4

location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the Location.

The policy includes a limitation of ICD coverage of $1 million per occurrence. And it defines an "occurrence" as "[a]ll loss(es) or damage that is attributable directly or indirectly to one cause or a series of similar or related causes."

Near the beginning of the COVID-19 pandemic, on March 13, 2020, Life Time closed two of its Pennsylvania locations after Pennsylvania's governor announced he was "ordering the closure of all schools, community centers, gyms, and entertainment venues" in Montgomery County. By March 16, 2020, governmental authorities in multiple jurisdictions across the country had issued orders that required Life Time to close 56 locations. Over the next four days, another 66 Life Time locations were subject to governmental shutdown orders, and by April 2, 2020, all 150 of them were ordered to be closed.

The timelines for reopening varied across the country. Some shutdown orders were extended without a break. And some jurisdictions ordered a second round of closures after allowing the fitness centers to reopen for a period. In total, 29 jurisdictions issued shutdown orders that affected Life Time's locations. Across those 29 jurisdictions, Life Time identifies 41 orders that required it to close locations. That number accounts for the first round of shutdown orders and any subsequent shutdown orders that were issued after a period of reopening.

Life Time submitted a claim for ICD coverage to Zurich in late March 2020, asserting losses at approximately 150 locations. Zurich took the position that all COVID-

5

19-related closures constituted one occurrence under the policy. As a result, it determined that Life Time's coverage for its losses across all locations was capped at $1 million.

Life Time brought an action against Zurich, asserting declaratory-judgment and breach-of-contract claims in relation to the ICD coverage. The district court bifurcated discovery to allow initial summary-judgment motions limited to coverage issues. The parties filed cross-motions for summary judgment. In its summary-judgment motion, Life Time argued that it was entitled to $1 million in coverage for each of its insured locations. Life Time alternatively argued the position that it advances on appeal—that even if its coverage was limited to $1 million per occurrence, there were 41 occurrences based on 41 distinct shutdown periods. Zurich maintained its position that there was just one occurrence because the losses were caused by the COVID-19 pandemic.

In an order dated July 25, 2024, the district court granted Zurich's motion for summary judgment, denied Life Time's motion, and dismissed Life Time's claims with prejudice. In a memorandum accompanying the order, the district court determined that the "'cause' for determining an Occurrence is the precipitating event," which, in this case, was "the threat of Covid, not the shutdown orders." The district court determined that there was only one occurrence because "the COVID pandemic was a singular force causing the shutdown of Life Time's clubs."

Life Time appeals.

## ISSUES

1.      Did the district court err by determining that the "cause" of Life Time's losses for purposes of establishing an "occurrence" under the policy was the COVID-19

6

pandemic, and not the governmental shutdown orders that directed Life Time to close its locations?

2.      If each governmental shutdown order was a "cause" of Life Time's losses for purposes of establishing an "occurrence" under the policy, did the orders issued by multiple jurisdictions, or multiple orders issued in a single jurisdiction, constitute a "series of similar or related causes"?

**ANALYSIS**

Life Time argues that the meaning of "cause" in the definition of "occurrence" turns on the meaning of the ICD endorsement. Specifically, Life Time posits that, because the ICD endorsement provides coverage for losses that are "caused by" a governmental shutdown order, each governmental order that required Life Time to close locations is a "cause" of its losses for purposes of determining the number of occurrences subject to the $1 million ICD coverage limit. Under that theory, Life Time maintains that there are 41 occurrences—one for each of the distinct shutdown periods that it has identified. On the other hand, Zurich maintains that the governmental orders are relevant to trigger coverage under the policy, but for purposes of determining the number of occurrences subject to the coverage limit, we should look only to the underlying cause of Life Time's losses: the threat of the spread of COVID-19.

In considering these arguments on appeal from a grant of summary judgment, this court reviews "whether there are any genuine issues of material fact and whether the district court erred in its application of the law." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76 (Minn. 2002). Additionally, "[t]he interpretation of an insurance policy and

7

the application of the policy to the undisputed facts of a case are questions of law that [appellate courts] review[] de novo." *Com. Bank v. W. Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015); *see also Medica, Inc. v. Atl. Mut. Ins. Co.*, 566 N.W.2d 74, 76 (Minn. 1997) (explaining that, when "the parties do not dispute the relevant facts, a *de novo* standard of review is applied to determine whether the district court erred in its application of the law"). Life Time and Zurich filed cross-motions for summary judgment, and we do not discern any genuine issues of material fact underlying this coverage dispute. We therefore focus our de novo review on interpreting the insurance policy to determine how many occurrences there were in relation to the closures of Life Time's locations in 2020.

We first analyze the "cause" or "causes" of Life Time's losses—the governmental orders or the COVID-19 pandemic—for purposes of establishing what constitutes an "occurrence" under the policy. Then, because we conclude that the governmental orders were the causes, we address whether and which of those orders constitute a "series of similar or related causes."

## I

As a threshold matter, we observe that the Minnesota Supreme Court has declined to adopt the "cause test" that is used in other jurisdictions to determine the number of occurrences under an insurance policy. *See Am. Com. Ins. Brokers, Inc. v. Minn. Mut. Fire & Cas. Co.*, 551 N.W.2d 224, 230-31 (Minn. 1996). The cause test "considers if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages." *Big Lots Stores, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 240 F. Supp. 3d 725, 732 (S.D. Ohio 2017) (quotation omitted); *see also Bus. Interiors, Inc. v. Aetna Cas.*

8

*& Sur. Co.*, 751 F.2d 361, 363 (10th Cir. 1984) (providing that "an occurrence is determined by the cause or causes of the resulting injury" (quotation omitted)). Instead, the supreme court has taken a more pragmatic approach in identifying an occurrence that begins with the language of the policy itself. *See Am. Com. Ins. Brokers, Inc.*, 551 N.W.2d at 229-31 (interpreting definition of "occurrence" within the policy at issue).

The "objective when interpreting an insurance policy is to ascertain and give effect to the intentions of the parties as reflected in the terms of the policy." *King's Cove Marina, LLC v. Lambert Com. Constr. LLC*, 958 N.W.2d 310, 316 (Minn. 2021) (quotation omitted). And "general contract principles govern the construction of insurance policies." *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 879 (Minn. 2002). Unambiguous policy language takes its plain and ordinary meaning, while ambiguous language is construed in favor of coverage. *Id.* at 880.

Here, the coverage limit for the ICD endorsement is $1 million per occurrence and, again, an occurrence is defined as "[a]ll loss(es) or damage that is attributable directly or indirectly to *one cause* or a series of similar or related *causes*." (Emphasis added.) To understand what constitutes a "cause" for purposes of the ICD coverage limit, the endorsement language defining ICD coverage is instructive. The endorsement states that Zurich will provide ICD coverage "if the Suspension is *caused by* order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases[.]" (Emphasis added.) That is, the cause that triggers coverage for losses resulting from the suspension of business activities under the endorsement is a governmental order. Without an order, there is no coverage. And although the endorsement provides that the

9

governmental order must relate to regulation of "the threat of the spread of communicable disease," the existence of a threat of communicable disease alone does not cause losses that are covered under the endorsement.

In turn, when interpreting the meaning of "cause" for purposes of the coverage limit of $1 million per occurrence, we understand it to be the same cause as the cause that establishes coverage under the ICD endorsement—a governmental shutdown order. Both the ICD endorsement and the coverage limit provision require the same determination: what is the cause of the losses, i.e., what are the losses caused by. Reading the language of the policy consistently, we adhere to the established principle in contract interpretation that we "construe the contract as a whole and attempt to harmonize all of its clauses." *See Kuhn v. Dunn*, 8 N.W.3d 633, 637 (Minn. 2024) (quotation omitted). In contrast, there is no basis in the policy's language to support Zurich's construction of the word "cause" in the coverage-limit provision as different from the cause identified in the ICD endorsement.

In support of its argument that the COVID-19 pandemic is the "cause" for purposes of the coverage-limit provision, rather than the governmental orders, Zurich relies on *Lipshultz v. General Insurance Co. of America*, 96 N.W.2d 880 (Minn. 1959). In *Lipshultz*, the plaintiffs sought to recover under an insurance policy that provided coverage to their grocery business, including coverage for "direct loss by windstorm." 96 N.W.2d at 881. A strong windstorm hit the city, which caused a break in the power lines serving the area in which the plaintiffs' building was located. *Id.* Although the power lines leading to plaintiffs' store remained intact, the break resulted in a "complete interruption of the electric power supply" to the store. *Id.* Without power for the refrigerating equipment, there

10

was spoilage and shrinkage of the plaintiffs' inventory. *Id.* The supreme court determined that the plaintiffs' losses were covered by the insurance policy, reasoning that the word "direct" in the policy meant "merely 'immediate' or 'proximate.'" *Id.* at 886. And the plaintiffs' loss of inventory following the windstorm fell within the meaning of "direct loss by windstorm." *See id.*

Applying *Lipschultz*, Zurich argues that we should "look[] to the efficient and proximate cause of a loss to determine the coverage available for an insured's claim." But this case is unlike *Lipshultz*. First, *Lipshultz* is a case about coverage under insurance policies, not about coverage limits as determined by the number of occurrences. *See id.* at 881 (noting that the "liability of each company was limited to the face amount of its policy"). Therefore, *Lipshultz* does not support Zurich's argument that the cause for purposes of establishing coverage is somehow different from the "cause" for purposes of establishing the number of occurrences subject to the coverage limit. Second, focusing on the policy language as the supreme court did in *Lipshultz*, we conclude that *Lipshultz* is not analogous. The ICD endorsement does not define covered losses as "direct" losses, such that we should import a proximate-cause analysis into the contract in the same manner that the court did in *Lipshultz*. Instead, the endorsement identifies losses as those *caused by an order* of an authorized governmental agency enforcing any law or ordinance regulating a communicable disease. Third, even if we were to apply a proximate-cause analysis for purposes of determining what constitutes an "occurrence" in the coverage limit provision, we would determine that the threat of the spread of COVID-19 was not the proximate cause of Life Time's losses. Life Time's losses occurred because governments decided to issue

11

shutdown orders in response to that threat. Those orders were independent actions that varied in time, length, and degree. Some governments chose to allow businesses to remain open; others ordered widespread closures. The bulk of the shutdown orders occurred in March 2020, but some jurisdictions ordered additional periods of shutdown when variants of the original pathogen drove resurging case counts. Ultimately, the orders were separate from "the threat of the spread of communicable disease" that persisted throughout the COVID-19 pandemic.

Our interpretation of the definition of "occurrence" finds support in a federal district court decision that concluded when interpreting similar policy language that governmental orders and not the pandemic were the "cause" in the context of an occurrence provision— even in a state that follows the cause test. *Dental Experts, LLC v. Mass. Bay Ins. Co.*, No. 20 C 5887, 2022 WL 2528104, at *3 (N.D. Ill. July 7, 2022). In *Dental Experts*, the plaintiff sought coverage under an insurance policy that provided disease contamination coverage for losses sustained as a result of suspension of business operations if the suspension was "caused by a disease contamination event declared by the National Center for Disease Control, or the applicable city, county or state Department of Health." *Id.* at *1. The policy defined an "occurrence" as "all loss or damage that is attributable to . . . [a]n act, event, cause or series of similar, related acts, events or causes[.]" *Id.* The court determined that the insured's losses were "'attributable' to" the governmental orders requiring shutdowns, "not the disease or the pandemic itself," and that the orders were therefore "the operative occurrence." *Id.* at *3. We find that analysis persuasive for the reasons discussed above. The losses subject to coverage here are "attributable to," i.e., caused by, the governmental

12

orders, not the pandemic itself. It follows that the orders are also the causes of the losses for purposes of determining the coverage limit.

Instead of following the reasoning set forth in *Dental Experts*, Zurich urges us to look to another federal district court decision, *Count Basie Theatre Inc. v. Zurich American Insurance Co.*, No. CV 21-00615, 2024 WL 2763762 (D.N.J. May 29, 2024). In that case, an insured sought coverage after it was required to close its performing arts facilities during the COVID-19 pandemic. *Count Basie*, 2024 WL 2763762, at *4. The insurance policy at issue provided coverage for losses from suspension of business operations if the suspension was "caused by an order of an authorized public health official or governmental authority that prohibits access to the 'premises' . . . result[ing] from the discovery or suspicion of a communicable disease or threat of the spread of a communicable disease[.]" *Id.* at *2. Applying the cause test, the *Count Basie* court determined that "the injury sustained by Count Basie stems from a common cause—the spread of COVID-19." *Id.* at *9. As we noted above, the Minnesota Supreme Court has declined to adopt the "cause" test. *Am. Com. Ins. Brokers, Inc.*, 551 N.W.2d at 230-31. But even if we were to apply it, we are more persuaded that the losses are attributable to the orders and not the pandemic itself.

For the foregoing reasons, we conclude that each governmental order was a "cause" of Life Time's losses. We therefore reject Zurich's argument that there was a single cause under the definition of an "occurrence," and we turn to an analysis of the number of occurrences and, specifically, whether the governmental orders constituted a series of similar or related causes.

13

## II

The policy defines an occurrence as "[a]ll loss(es) or damage that is attributable directly or indirectly to one cause or *a series of similar or related causes*." (Emphasis added.) We have concluded that Life Time's losses under the policy here were caused by the governmental orders. Because there was more than one order, i.e., more than one cause, we must determine whether the orders or any subset of them constitute "a series of similar or related causes."

The supreme court interpreted similar language in *American Commerce*, holding that policy language defining an occurrence as "a series of related acts" was not ambiguous and applying it to conclude that there were two occurrences under the policy at issue in that case. 551 N.W.2d at 228, 230-31. Applying a pragmatic approach, the supreme court stated that "a court may consider several factors in concluding whether . . . acts are part of a 'series of related acts,' including whether the acts are connected by time, place, opportunity, pattern, and, most importantly, method or modus operandi." *Id.* at 231.

In that case, an employee of American Commerce embezzled $190,000 over a one-year period. *Id.* at 226. The employee embezzled in two ways: by issuing unauthorized payroll checks to herself and by taking funds received from insurance premiums. *Id.* at 231. American Commerce submitted a claim under its insurance policy that contained employee dishonesty coverage. *Id.* at 227. The supreme court declined to consider each of the 155 individual acts of embezzlement as separate occurrences. *Id.* at 229-30. Instead, the supreme court concluded that each method the employee used to embezzle money was a separate occurrence, such that every instance the employee embezzled using the same

method collectively was a "series of related acts." *Id.* at 231. That was because the acts "followed each other in time" and occurred at her place of work during business hours. *Id.* Thus, the supreme court concluded that there were two total occurrences. *Id.*

Here, just as the supreme court did in *American Commerce*, we take a pragmatic approach to determining the number of occurrences that arose under the insurance policy. Considering the plain meaning of terms in the contract, we observe that a "series" is defined as "[a] number of objects or events arranged or coming one after the other in succession." *The American Heritage Dictionary of the English Language* 1600 (5th ed. 2018). We also take note of the supreme court's description of a series as acts that "followed each other in time." *Am. Com. Ins. Brokers, Inc.*, 551 N.W.2d at 231.

With respect to governmental orders issued in separate jurisdictions, we conclude that they are not a "series." The orders from different jurisdictions here did not come one after another in succession. Many jurisdictions released orders on the same day, and there was no connection between when, how, and whether the different jurisdictions released their own shutdown orders. It cannot logically be said that orders released in separate jurisdictions, with no relationship to one another, could be considered a series.

But we conclude that multiple orders from the same jurisdiction are a "series." Some jurisdictions allowed businesses to reopen after a period of closure but then issued additional shutdown orders based on the course of the pandemic. Life Time urges us to consider the second round of shutdown orders in a jurisdiction as separate occurrences, and not part of a "series of similar or related causes." We decline to do so. If a jurisdiction issued a new shutdown order after reopening, it cannot be denied that the first and second

orders are events that occurred in succession. Like in *American Commerce*, in which multiple acts of embezzlement using the same method were considered one occurrence, multiple orders issued in succession within the same jurisdiction are one occurrence when considering the "time, place, opportunity, pattern, and . . . method or modus operandi." 551 N.W.2d at 231.

Our conclusion that orders within a single jurisdiction are a series is consistent with the caselaw cited by both parties. In *Dental Experts*, the court determined that "[n]o reasonable factfinder could construe an executive order that flows from a prior order by the same authority—in other words, a subsequent executive order in the same jurisdiction that effectively served as a renewal—as a separate occurrence[.]" 2022 WL 2528104, at *4. In determining the number of occurrences, the court looked to "just one order per jurisdiction." *Id.* We do the same here. And in *Count Basie*, in which the court was faced with governmental orders within only one jurisdiction, the court determined that all governmental orders within that jurisdiction constituted a "singular occurrence." 2024 WL 2763762, at *9 n.13 (noting that "the Executive Orders were issued as part of New Jersey's continuing response to the ongoing threat of the COVID-19 pandemic"). Similarly, we conclude that, within one jurisdiction, each subsequent governmental order flowed from that jurisdiction's prior order as part of its ongoing response to the pandemic. Each order within one jurisdiction is therefore part of a "series of similar or related" orders and, together, all orders issued in one jurisdiction make up one occurrence.

Because the governmental orders within the same jurisdiction constitute one occurrence, we conclude that there were 29 occurrences, rather than 41 occurrences as Life Time argues.

**DECISION**

Under the language of the insurance policy at issue here, which provides coverage for interruption by communicable disease "if the [s]uspension is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases" and defines an occurrence as all losses "attributable directly or indirectly to one cause or a series of similar or related causes," we conclude that the governmental shutdown orders were the causes of Life Time's losses under the policy, and not the pandemic. Further, we conclude that, while governmental orders from separate jurisdictions do not constitute a "series of similar or related causes," governmental orders issued within the same jurisdiction do constitute such a "series" under the policy. We therefore reverse and remand for further proceedings not inconsistent with this opinion.

**Reversed and remanded.**